FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2017 JUN -9  PM 3: 39

JEFFREY P. COLWELL
CLERK

BY_____DEP. CLK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No: 16-CV-02480-WJM-CBS

| | |
|---|---|
| Gilbert T. Tso, a natural person and an American,<br><br>        Plaintiff,<br><br>v.<br><br>Rebecca Murray (a.k.a. Tso), individually, Tanya Akins, individually, SHERR PUTTMANN AKINS LAMB PC, a law firm, Jeannie Ridings, Individually, KILILIS RIDINGS & VANAU PC, a law firm, Russell M. Murray, individually, Dena Murray, individually, Joanne Jensen, individually Richard F. Spiegle Psy.D., individually, DENVER DISTRICT COURT, a municipal entity, DENVER DEPARTMENT OF HUMAN SERVICES, a municipal entity, CITY AND COUNTY OF DENVER, a municipal entity, COLORADO DEPARTMENT OF HUMAN SERVICES, a governmental unit or political sub-division of the STATE OF COLORADO,<br><br>Defendants. | Article III, Court of Records Common Law<br><br>Verified Complaint for:<br><br>==============================<br><br>Civil RICO<br>    18 U.S.C. §§ 1962(c)(d);<br><br>Injunctive Relief (Sought)<br>    18 U.S.C. §§ 1345, 1514<br>    28 U.S.C. §§ 2201, 2202, 2283<br><br>Violations of Civil Rights, States & Federal Statutes<br>    14th Amendment U.S. Constitution;<br>    5th Amendment U.S. Constitution;<br>    42 U.S.C. §§ 654, 658, 666, 2000d-7;<br>    18 U.S.C. §§ 286, 287, 371, 1031<br>    18 U.S.C. §§ 1341, 1343; 1584, 1589;<br>    18 U.S.C. §§ 1951-1952;<br>    C.R.S. § 18-8-306;<br>    720 ILCS § 5/32-4e; § 32-14; § 33-1;<br><br>Constitutional Challenge to Colorado State Statute C.R.S. § 14-10-124<br><br>Demand for Trial by Jury where permitted. |

---

### Verified Complaint (2nd Amended)

---

Comes now Plaintiff, Gilbert T. Tso, *Pro Se/Pro Per/Sui Juris*, a natural person, an American and one of "We the People of the United States" as defined in the preamble of the Constitution for the United States, in support of this verified complaint, and on the federal questions involved,

herein alleges having suffered violations of his fundamental rights and loss of property, presents the following causes of action.

## TABLE OF CONTENTS

NATURE OF CASE ....................................................................................................... 4

JURISDICTION AND VENUE ....................................................................................... 5

PARTIES ......................................................................................................................... 6

RESERVATION OF RIGHTS DUE TO FRAUD ........................................................ 11

NOTICE OF RELATED CASES ................................................................................... 11

    Record of State Proceedings ...................................................................................... 12

STANDING .................................................................................................................... 12

FACTUAL BACKGROUND ......................................................................................... 13

    The Title IV-D Program and Meaning of "Noncustodial Parent" ............................. 13

    Title IV-D Incentive Scheme and Conflict of Interest .............................................. 17

    Conspiracy to Deny Rights and to Convert Property ................................................ 18

    Relevance of the Uniform Interstate Family Support Act (UIFSA) .......................... 19

        Addressing Occurrences of Competing Jurisdictions ........................................... 20

    Colorado Revised Statutes (CRS) § 14-11-101 ........................................................ 21

    The Social Contract and Public Sector Honest Services .......................................... 22

    Federal and State Obligations Not Met Under the Social Contract ........................... 23

        Undisclosed Conflicts of Interest ........................................................................... 23

CAUSES OF ACTION ................................................................................................... 25

COUNT 1 – 5th AMENDMENT VIOLATIONS FROM THE PUBLIC TAKING OF PROPERTY WITHOUT JUST COMPENSATION (42 U.S.C. § 1983; C.R.S. § 13-80-102) 25

    Defendants ................................................................................................................. 25

    Facts and Argument ................................................................................................... 25

        Taking versus Penalty ............................................................................................ 26

        Public Use of Child Support Obligations ............................................................... 26

        Plaintiff's Injuries and the Amount of Property Seized for Public Use ................. 27

COUNT 2 – CIVIL VIOLATIONS OF 18 U.S.C. § 1962(c) ....................................... 28

    Defendants ................................................................................................................. 28

Defendants Engaged in and Affected Interstate Commerce. ...................................... 29

Other Wrongdoers.................................................................................................. 30

The Victim ............................................................................................................ 30

The Enterprise ...................................................................................................... 31

Defendants' "Association-in-Fact" ........................................................................ 34

    Purpose ............................................................................................................ 34

    Defendants' Relationship and Individual Roles .................................................. 35

    Duration of Existence and Continuity................................................................ 36

Multiple Artifices to Defraud................................................................................. 37

    First Scheme..................................................................................................... 38

    Second Scheme. ................................................................................................ 38

    Use of Kickbacks in 2nd Scheme....................................................................... 41

Pattern and Conduct ............................................................................................ 42

Those Pursuant to 720 ILCS 5/33G....................................................................... 42

    Civil Violations of 720 ILCS 5/32-4e – Interfering with the Duties of a Judicial Officer ... 42

Those Pursuant to C.R.S. § 18-17-101 ................................................................... 45

    Civil Violations of C.R.S. § 18-8-306 – Attempting to Influence a Public Servant............ 45

Those Pursuant to 18 U.S.C. § 1961 ...................................................................... 46

    Acts and Liabilities Under 18 USC § 1584 – Involuntary Servitude ................... 46

    Acts and Liabilities Under 18 USC § 1589 (b) – Forced Labor ........................... 48

    Acts and Liabilities Under 18 USC § 1951 – Extortion and Robbery................... 49

    Acts and Liabilities Under 18 USC § 1952 – Interstate Travel in Aid of Racketeering....... 50

    Acts and Liabilities Under 18 USC §§ 1341, 1343 – Honest Services, Mail and Wire Fraud
.............................................................................................................................. 51

Injury and Loss to Plaintiff's Business and Property................................................ 56

COUNT 3 – CIVIL VIOLATIONS OF 18 U.S.C. § 1962 (d) ........................................ 56

    Defendants ....................................................................................................... 56

    Defendants Engaged in Conspiracy to Violate 18 U.S.C. § 1962(c)........................ 57

    Plaintiff's Injuries and Relief Sought ................................................................ 58

COUNT 4 – 14th Amendment Violation of UIFSA § 605(b)(2) and C.R.S. §§ 14-5-607 (42
U.S.C. §§ 1983) .................................................................................................... 59

    Defendants ....................................................................................................... 59

Acts and Liabilities .................................................................................................. 59

Violations of C.R.S. §14-5-607 – Right to Contest of registration or enforcement. ............ 59

Factual Allegations .................................................................................................. 60

Plaintiff's Injuries and Relief Sought ........................................................................ 61

COUNT 5 – CRS § 14-10-124 IS UNCONSTITUTIONAL ........................................... 62

Plaintiff's Standing to Challenge Colorado Statutes ................................................. 63

Argument .................................................................................................................. 64

SUMMARY AND PRAYER ....................................................................................... 66

## <u>NATURE OF CASE</u>

1.   This Complaint arises from an alleged breach in the social contract[1] between state political subdivisions and municipal entities of the State of Colorado, and one of the people, herein your Plaintiff, where Plaintiff's and the people's right of access to impartial tribunals has been adversely affected and violated by federal incentives, structured by federal statutes, to bias: i) the judgment of state courts in a manner consistent with 28 U.S.C. § 455 had these cases been before a United States court, and ii) municipal entities in a manner assuring optimum federal payments to the state through various financial arrangements with said courts; and for the states' political subdivisions and municipal entities to financially exploit parents involved in custody disputes within its jurisdiction for profit and gain.

2.   Further, Plaintiff has suffered injuries to property and federal rights arising from acts and omissions of the Defendants for: i) conduct encompassed under state and federal racketeering statutes, and ii) violations of the 14th and 5th Amendments of the federal constitution.

---

[1] See Black's Law Dictionary, 10th Edition

3. Plaintiff's complaint focuses on the conduct of the Defendants, individually and collectively, and not on the underlying state court proceedings.

4. This case brings up for review (i) how the federal monetary incentives doled out to states under 42 U.S.C. §§ 651-669 (*hereinafter*, "Title IV-D") discriminate and deny equal protections and substantive due process against an entire class of people who are natural parents involved in custody disputes generally designated "non-custodial parent", and (ii) how redress is virtually impossible in the state courts and agencies when corrupt enterprises and associations-in-fact incented by a transfer of the targeted victim's wealth and federal payments under Title IV, obstruct justice and deny honest services to the victims involved; and (iii) constitutional questions regarding *Parens Patriae*.

5. Plaintiff seeks the following: a) to recover losses and financial damages to personal business and property provided to victims under 18 U.S.C. § 1964; and b) pursuant to the provisions of the 5th Amendment of the Constitution of the United States, Plaintiff seeks via this inverse condemnation suit, compensation for property taken by CITY AND COUNTY OF DENVER HUMAN SERVICES and STATE OF COLORADO DEPARTMENT OF HUMAN SERVICES.

6. Federal authority is required to properly interpret the requirements of the federally funded Social Security Welfare programs under Subchapter IV, 42 U.S.C. §§ 601-679 (hereafter, "Title IV") and enjoin constitutionally valid execution of the programs.

### JURISDICTION AND VENUE

7. The District Court of the United States is an Article III court with authority to hear questions arising under the Constitution, Laws, and Treaties of the United States including the International

Covenant on Civil and Political Rights, and the Universal Declaration of Human Rights, with Reservations.

8.  This District Court of the United States has original, concurrent, and supplementary jurisdiction pursuant to 28 USC § 1331, 28 USC § 1332 and 28 USC § 1343(a) for all causes of action arising from 42 USC § 1983, 42 USC § 1985, 18 USC §§ 1962, 1964; under 28 USC § 1367(a) for all claims alleged under Supplemental Jurisdiction; and further, in compliance with 28 USC § 1658 for all civil actions arising under Acts of Congress.

9.  Jurisdiction and pendant claims are further supported by Title IV-D of the Social Security Act generally, and 42 U.S.C. 652 (a)(8) specifically.

10. This Court has well established authority to grant declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and pursuant to F.R.Cv.P. Rule 57.

11. Venue and process is quite and solely proper in this U.S. District Court, pursuant to 18 U.S.C. § 1965 (a) and (b) for all claims under 18 U.S.C. §§ 1962 and 1964.  Many events and omissions committed by defendant individuals and the defendant enterprises named herein are of a nature affecting interstate commerce, including injuries and damages giving rise to the claims herein of which the majority fully matured and materialized in the State of Colorado.

**PARTIES**

PLAINTIFF

12. Plaintiff Gilbert T. Tso (*hereinafter* "Gilbert") is a natural person, an American and one of "We the People of the United States" as defined in the preamble of the Constitution for the United

1

2   States, residing in Denver County in State of Colorado, within the United States of America, and

3   the natural parent of one minor child, also an American by birth.

4   DEFENDANTS

5   13. Defendant Rebecca Murray (*hereinafter* "Rebecca") is an adult citizen and resident of

6   Denver County, State of Colorado, United States of America; the natural parent of a minor child

7   whose other natural parent is the Plaintiff. Rebecca is neither an infant, an incompetent, nor away

8   on any military service, and is sued and prosecuted in her individual person.

9   14. Defendant Tanya Akins (hereinafter "Akins") is an adult citizen and resident living

10   presumably in Denver or neighboring county, State of Colorado, United States of America, and at

11   all material times herein practiced law as a state-licensed attorney and Officer of the Court within

12   the courts of the very same and neighboring counties in Colorado. She is neither an infant, an

13   incompetent, nor away on any military service, and is sued and prosecuted in both her individual

14   person, as a partner and officer in the firm of SHERR PUTNAM AKINS & LAMB PC, and as an

15   officer of the same state court system, as well as for divestitures to the extent allowed.

16   15. Defendant SHERR PUTTMANN AKINS LAMB PC (*hereinafter* "SPAL PC") is a private

17   enterprise engaged in legal services and representation, located at 5299 DTC Blvd., Greenwood

18   Village, CO 80111.

19   16. Defendant Jeannie M. Ridings (*hereinafter* "Ridings") is an adult citizen and resident living

20   presumably in McHenry County, State of Illinois, United States of America, and at all material

21   times herein practiced law as a state-licensed attorney and Officer of the Court within the courts

22   of the very same and neighboring counties in Illinois. Jurisdiction under 18 U.S.C. § 1965(b), (d)

23   is invoked, *see Cory v. Aztec Steel Bldg., Inc.* 468 F.3d 1226, 1231 (10th Cir. 2006), and Ridings

24

is sued in both her individual person, and as a partner and officer in the firm KILILIS RIDINGS & VANAU PC, and as well as for divestitures to the extent allowed. She is neither an infant, an incompetent, nor away on any military service.

17. Defendant KILILIS RIDINGS & VANAU PC (*hereinafter* "KRV PC") is a private enterprise engaged in legal services and representation, located at 380 Terra Cotta Rd, Crystal Lake, IL 60012. Jurisdiction under 18 U.S.C. § 1965(b), (d) is invoked, *see Cory v. Aztec Steel Bldg., Inc.* 468 F.3d 1226, 1231 (10th Cir. 2006).

18. Defendant Russell M. Murray, (*hereinafter* "RM Murray") is an adult citizen and resident of Arapahoe County, State of Colorado, United States of America; the natural father of Defendant Rebecca. RM Murray is neither an infant, an incompetent, nor away on any military service, and is sued in his individual person.

19. Defendant Dena Murray, (*hereinafter* "D Murray") is an adult citizen and resident of Arapahoe County, State of Colorado, United States of America; the step-parent of Defendant Rebecca. D. Murray is neither an infant, an incompetent, nor away on any military service, and is sued in her individual person.

20. Defendant Joanne Jensen, (*hereinafter* "Jensen") is an adult citizen and resident of El Paso County, State of Colorado, United States of America; the natural mother of Defendant Rebecca. Jensen is neither an infant, an incompetent, nor away on any military service, and is sued in her individual person.

21. Defendant Richard F. Spiegle, Psy.D., (*hereinafter* "Spiegle") is an adult citizen and presumed resident of Denver County, State of Colorado, United States of America; Spiegle is a

licensed psychologist practicing in family relations and child custody matters, is neither an infant, an incompetent, nor away on any military service, and is sued in his individual person.

22. Defendant DENVER DISTRICT COURT, (*hereinafter* "Denver District Court") is a local municipal entity, operating as an arm of the judicial system for THE CITY AND COUNTY OF DENVER, COLORADO and STATE OF COLORADO.  Within its jurisdiction is the function of enforcing the policies of the local municipality and STATE OF COLORADO; it shares with DENVER COUNTY DEPARTMENT OF HUMAN SERVICES the role of establishing and enforcing child support orders pursuant to Title IV-D of the Social Security Act on behalf of THE CITY AND COUNTY DENVER, COLORADO and STATE OF COLORADO. Defendant Denver Court employs judicial officers, clerks and administrative staff, including the Hon. Judge Elizabeth A. Starrs, the Hon. Judge Ross B. H. Buchanan, and the Hon. Judge David H. Goldberg, and is sued as a municipal entity, a "person" as construed under 42 U.S.C. § 1983, and as the *respondeat superior* for the actions of these three aforementioned Officers of the Court, their staff and the Office of the Clerk of the Court, and pursuant to the plurality opinion in *Stop the Beach Ren. v. Fla. Dept. of Env. Prot.*, 2601-02, 130 S. Ct. 2592 (2010); *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 – Supreme Court, (1978); *Conley v. Pryor*, U.S. District Court, D. Kansas, (2015).

23. Defendant COLORADO DEPARTMENT OF HUMAN SERVICES (*hereinafter* "Colorado DHS") is a political subdivision; among its several functions is responsibility for implementing and coordinating the various policies and guidelines of the STATE OF COLORADO and UNITED STATES DEPT. OF HEALTH AND HUMAN SERVICES - OFFICE OF CHILD SUPPORT ENFORCEMENT.  These various policies and guidelines regulating the

STATE OF COLORADO's collections of federal financial incentives under the federal Title IV-D program. Defendant Colorado DHS is sued as a "person" as construed under 42 U.S.C. § 1983, and in its *respondeat superior* capacities if applicable over its subordinate political subdivisions and municipal entities.

24. Defendant DENVER COUNTY DEPARTMENT OF HUMAN SERVICES, (*hereinafter* "Denver DHS-CSS") is a municipal entity responsible for: 1) the administration of the federal payments to states for the reimbursement of administrative expenses and incentive payments for its performance under the federal Title IV-D programs, and 2) administration of the City and County of Denver's Title IV-D Child Support Services, TANF and Child Support Enforcement activities and programs. Denver DHS-CSS further implements the policies and practices of the STATE OF COLORADO DEPT. OF HUMAN SERVICES, on behalf of serving the CITY AND COUNTY OF DENVER, COLORADO, subject to state and federal guidelines as embodied in the UIFSA, in the conduct of reporting local performance for the purposes of tabulating federal incentives under 42 USC § 655 & 42 USC § 658. Denver DHS-CSS is sued as a "person" as construed under 42 U.S.C. § 1983, and as the *respondeat superior* if applicable for the actions of its subordinate officers and employees named herein.

25. Defendant CITY AND COUNTY OF DENVER, COLORADO (*hereinafter* "Denver County"), is a local political subdivision and unit of government responsible for all municipal business and acts of the City and County, and their enforcement, created under the laws and policies of the STATE OF COLORADO. Defendant Denver County is ultimately responsible for seeing that its various courts, law enforcement, and all such other agencies and systems are administered so as not to conflict with any statutes, rules, regulations, policies or the constitutions

of either STATE OF COLORADO or the UNITED STATES OF AMERICA. Defendant Denver County is sued as a municipal entity, as a "person" pursuant to 41 U.S.C. § 1983 for its origination of policies and local practices for acts and/or omissions leading to violations of federal or state statutes, and in the conduct of receiving federal incentives under 42 USC § 655 & 42 USC § 658, both by it and its subordinates described herein. Denver County is sued as a "person" as construed under 42 U.S.C. § 1983, and as the *respondeat superior* if applicable for the actions of its subordinate officers and employees named herein.

## RESERVATION OF RIGHTS DUE TO FRAUD

26. Pursuant to Rules 8, 15, 18 and 20 of the Fed. Rules of Civ. Procedure, Plaintiff explicitly reserves his right to amend this and all subsequent pleadings, should future events and/or discoveries prove that he has failed adequately to comprehend the full extent of the damages which he has suffered at the hands of the Defendants and other involved parties, both named and unnamed, now and always in the future.

## NOTICE OF RELATED CASES

27. Plaintiff respectfully demands mandatory judicial notice, pursuant to Rule 201(d) of the Federal Rules of Evidence, and pursuant to the Full Faith and Credit Clause, of the following parallel actions supporting and documenting some of the above allegations, to wit:

a) U.S. DISTRICT COURT, NORTHERN DISTRICT OF ILLINOIS

> Case No.: In the process of being filed (pending), against defendants COUNTY OF LAKE, 19TH JUDICIAL CIRCUIT COURT and ILLINOIS DEPARTMENT of CHILD AND FAMILY SERVICES.

b) U.S. DISTRICT COURT, DIST. OF COLORADO

Case No.: 1:15-CV-2398-REB-KLM (closed)

**Record of State Proceedings**

28. Plaintiff is proceeding based on the presumption that the *entire* COLORADO and ILLINOIS state court records and political subdivision records applicable and associated with Plaintiff's case will be made available to this Honorable Court upon Notice and Demand for Mandatory Judicial Notice, pursuant to Rules 201 and 902 of the Federal Rules of Evidence, the Full Faith and Credit Clause contained under Article IV of the U.S. Constitution, and 28 U.S.C. § 1449.

## **STANDING**

29. Plaintiff, having his civil and federal rights infringed and subsequently injured in personal property, has a federal question right under the protections of the Civil Rights Act of 1964; and 42 USC § 2000d-7 for provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance, such as the financial incentive payments to states under Title IV-D of the Social Security Act; and as interpreted most recently by the U.S. Supreme Court in the case of *Obergefell v. Hodges*, 576 U.S. __ (2015), to *include* prohibitions against discrimination based on sex, gender, sexual orientation, marital status, class, etc., individually and collectively, to now seek an Article III Court review in order to be free from the denial of such equal civil and federal rights, and treatment alleged in this complaint.

30. Plaintiff has a further federal question right pursuant to 18 USC §1962(c)(d) to have his claims for injuries and losses to business and property, proximately caused by the acts and omissions of Defendants, be heard at trial by jury in an Article III Court of Record.

31. Plaintiff has a further federal question right to not be discriminated against, under the expressed public policy of the United States, by and through certain Acts of Congress strictly specifying the critical value of protecting children, youth, and family bonds, and the joint responsibilities of federal courts therein. *See* 42 USC §§ 12301, 12351, 12352, 12371, 12635, etc.

32. Plaintiff has a further federal question right, under 42 USC §14141, to be free from unlawful and constitutional violations of his civil rights and his fundamental liberty interests as a natural parent, and redress at trial by jury in an Article III Court of Record.

33. In the instant state proceedings, Plaintiff has been deprived of the full and unencumbered liberty interest in his fundamental right to equal care, custody, control, access to financial and material support, decision-making on matters of financial and material support, and parental management of his offspring when the minor child is under his care, and the same approaching five years, without any requisite showing of "unfitness" as defined by the statutory guidelines and standards of neglect.

## FACTUAL BACKGROUND

### The Title IV-D Program and Meaning of "Noncustodial Parent"

34. The Welfare Reform Act of 1966 reformulated the Social Security Title IV programs and extended the joint State-Federal cooperative program seeking to reduce waste and improve the efficient use of welfare expenditures. Because unsupported children must often look to the federal treasury for financial sustenance, Congress has a financial concern in effective Child Support enforcement. The resulting *Child Support Enforcement Programs*, Title IV-D, 42 U.S.C. §§ 651-669 thus became a central part of the Social Security Title IV programs administered by the ACF.

35. Prior to the Act of 1966, 42 U.S.C. § 602, *State plans for aid and services to needy families with children*, required: "A State plan for aid ... to families with dependent children with respect to a child who has been deserted or abandoned by a parent" and gave meaning to the classification of "absent parent" then in use for referring to the offending target parent.  Consistent with this meaning, Congress had before expressly clarified "absent parent" to exclude parents on active military duty.  This, in response to US Supreme Court opinion ruling the previously unqualified "absent parent" permitted children of active military personnel to seek Title IV benefits.  See, *King v. Smith*, 392 U.S. 309, 317 (1968).

36. Clearly, Title IV provisions were targeted to needy children whose parents had abandoned their parental duty and not simply absent due to separation. Congressional findings introducing the 1996 Act assure the original purpose of the Title IV programs to support families in need, was not discarded with the reformulation. The *Child Support Performance and Incentive Act of 1998* (H.R.3130) later augmented the 1996 revisions making targeted changes to Part D of Title IV.

37. The current 42 U.S.C. § 651, Child Support and Establishment of Paternity, Authorization of Appropriations, sets out the purpose of Part D of the Title IV Welfare program as:

> **For the purpose of enforcing the support obligations owed by noncustodial parents** to their children and the spouse (or former spouse) with whom such children are living, *locating noncustodial parents*, establishing paternity, obtaining child and spousal support, and assuring that assistance in obtaining support will be available under this part to all children (whether or not eligible for assistance under a State program funded under part A of this subchapter) for whom such assistance is requested, there is hereby authorized to be appropriated for each fiscal year a sum sufficient to carry out the purposes of this part. (***Emphasis added.***)

38. The Acts introduced the Federal classification of "Noncustodial Parents" to replace the earlier reference to "absent parent" and this Federal classification is now used throughout Parts A and D of Title IV. While "support obligations owed by noncustodial parents" is central to its operation, Title IV does not provide Federal requirements for the then newly coined Federal "Noncustodial Parents" classification (*hereinafter*, "FNCP"). Title IV-D does however include a key purpose of "locating noncustodial parents," and provides for creation of the Federal Parent Locator Service under § 653. Evidently, a FNCP is a quasi-criminal class of parent who has willfully abandoned her/his parental obligations and duties to the child.

39. The Acts did not suggest there was an intended change in the prior meaning of "absent parent." However, as apparent from *King*'s misinterpretation of Congress's intended scope of "absent parent," the intended meaning of that prior phrase was narrower than the simple dictionary meaning of "absent." This history suggests the FNCP classification was intended to further clarify and limit Federal claims to a targeted subset of "absent parent" who had willfully abandoned her duty as evident from the prior, then current, 42 U.S.C. § 602.

40. Consistent with this interpretation, federal courts have broadly recognized that Noncustodial Parents, presumed herein to mean "absent, noncustodial parent" or FNCP, have a reduced liberty interest in the companionship, care, custody, and management of their children; wherein, the interest of the Noncustodial Parent "is unambiguously lesser in magnitude than that of a parent with full legal custody." *Burke v. County of Alameda*, 586 F.3d 725, 733 (9th Cir.2009). Furthermore, federal courts have broadly recognized that "[t]he state's power to legislate, adjudicate and administer all aspects of family law, including determinations of custodial and visitation rights, is subject to scrutiny by the federal judiciary within the reach of the Due Process

and/or Equal Protection Clauses of the Fourteenth Amendment. ... In addition, the Fourteenth Amendment encompasses and applies to the States those pre-existing fundamental rights recognized by the Ninth Amendment, which provides: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."" *Wise v. Bravo*, 666 F. 2d 1328, 1332 (10th Cir. 1981).

41. The House Report emphasized that with the implementation of 42 U.S.C. § 666 "enforcement [will be] significantly strengthened to ensure that *absent noncustodial parents* provide financial support for their children." H. Rep. No. 104-651 at 5 (1996), 1996 U.S.C.C.A.N. 2183, 2186. Furthermore, the Act seeks to establish "uniform State tracking procedures ... established to catch *deadbeat parents* ...." H. Rep. No. 104-651 at 5 (1996), 1996 U.S.C.C.A.N. at 2186; See *Greidinger v. Almand*, 30 F. Supp.3d 413, 423 (D. MD. 2014). (*Emphasis added.*)

42. Congress was clearly focused on enforcing parental responsibility and ensuring children benefited from parents who otherwise were not providing for their children and so created a means to incent States to reduce the number of needy children resulting from child abandonment.

43. In arguendo, the statutes in question are Federal Law and only pertains to parents falling within the Federal meaning of "Noncustodial Parents" (i.e., FNCP); parents classified as "Noncustodial Parents" under Colorado State Law, or any other states' laws, are not necessarily FNCP.

44. For support obligations to be considered "support obligations owed by [FNCP]" and used to secure Title IV-D Federal Incentive grants, the parent must first be found guilty of having abandoned his/her children, leaving them in need of support or care. There is no such requirement

to be considered a Colorado NCP, and this provides further evidence Colorado classifications are not equivalent to the Federal meaning.

45. It is also evident from extensive Federal precedent that classifications such as FNCP carry inherent infringement of rights, especially when those rights are broadly recognized as fundamental; this classification cannot be casually assigned and that the Federal definition of a FNCP must have a clear, logical purpose. So much so, when statutory classifications approach sensitive and fundamental personal rights, Federal Courts exercise the strictest scrutiny. See *Weber v. Aetna Casualty & Surety Co.*, 406 US 164, 172 (1972). Without this clarity, loving, responsible parents may be improperly designated and stigmatize as "FNCP" resulting in a substantial loss of fundamental liberties and property as a parent arising from state court imposed financial obligations of child support.

46. Federal authority is required here to clarify the meaning of FNCP intended by Title IV and criteria required to demonstrate such an invidious Federal classification properly applies when State agencies seek Federal Incentive grants under Title IV-D.

### Title IV-D Incentive Scheme and Conflict of Interest

47. States' addiction to Federal incentive dollars distributed as "entitlement" monies under the Title IV-D programs create a conflict of interest between the State, its municipal entities responsible for domestic matters, and the parent-litigant seeking equal custody in the State's domestic relations courts. This problem has been openly acknowledged by the U.S. Dept. of Health and Human Services – Office of Child Support Enforcement and members of the U.S. Senate and House of Representatives. *See "Report on the Disincentives to Protection of Marriage, Military Personnel Retention and Recruitment, Resulting from Abuses by the States of the Child*

1

2 *Support Performance and Incentive Act (CSPIA)*, Prepared for U.S. Sen. Richard Burr, True

3 Equality Network, Research Triangle Park, No. Carolina, January 2006."

4     48. The State of Colorado, and the other 49 states and territories, have significant financial

5 incentives to maximize the amount of Title IV-D child support obligations so that they can report

6 it to the Federal Government under the various performance measures of the Title IV-D program.

7 For example, the larger the amount of court-ordered Title IV-D child support obligations or

8 outstanding arrearages assigned to an obligor, the more money Colorado collects from the

9 federal government; even if the amount ordered by the courts far exceeds the reasonable needs of

10 the child and notwithstanding the obligor's inability to pay.

11     49. Under the financial agreements with the county municipalities, defendants Colorado DHS

12 and Denver DHS-CSS distribute federal Title IV-D administrative and incentive payments as

13 required by 42 U.S.C. § 654(7) and financed under § 658(a), directing and incentivizing the

14 defendants Denver County and Denver District Court as necessary to ensure operating budgets

15 and financial goals are met.

16     **Conspiracy to Deny Rights and to Convert Property**

17     50. On or around May 26, 2011, without Plaintiff's consent defendant Rebecca, aided by

18 defendants R.M. Murray, D. Murray and Jensen, and presumably with the legal advice of

19 defendants Ridings and KRV PC, absconded with Plaintiff's offspring (the couple's minor child,

20 then at the age of 3 years and 10 months) from Wauconda, Illinois– the minor child's whereabouts

21 unknown to Plaintiff for at least three (3) consecutive days.

22     51. Defendant Rebecca was later discovered to have communicated with defendants Ridings

23 and KRV PC, as early as June 2010, if not earlier.

24

52. Defendants R.M. Murray, D. Murray, and Jensen are listed in federal court records to have provided substantial financial support, in the amount of several tens of thousands of U.S. Dollars, to defendant Rebecca in the period from 2011 through 2014, while litigation was underway in Illinois, and in Colorado.

53. Plaintiff retained several attorneys during the early phases of litigation, and engaged the firm of Grund & Leavitt at around December 2011 for the principle portion of litigation.  Plaintiff invokes F.R.Cv.P. 20, reserving his right to permissive joinder of parties upon the firm of Grund & Leavitt as a Defendant in this Complaint.

54. Mediation failed and court proceedings ensued, producing an avalanche of litigation, as defendant Rebecca with defendants R.M. Murray, D. Murray, Jenson, Ridings and KRV PC, sought to eliminate Plaintiff's parental rights through a vigorous campaign of defamation, slander, false allegations, abuses of process, malicious prosecution and vexatious litigation that would shock the conscience.

55. By June 2013, Colorado was home state for all parties, most significantly the minor child of Plaintiff and defendant Rebecca.  Defendant Rebecca subsequently retained the legal services of defendants Akins and SPAL PC.

56. Defendants Rebecca, R. Murray, D. Murray, Jensen, Akins, Ridings, KRV PC and SPAL PC formed an Association-in-Fact with the sole purpose litigating against the interests of Plaintiff.

### Relevance of the Uniform Interstate Family Support Act (UIFSA)

57. As a condition for participating in the federal incentives program administered by the Office of Child Support Enforcement (OCSE) under Title 42 U.S. Code Chapter 7, Part D § 658 (a) et seq., the states of Illinois and Colorado incorporated the Uniform Interstate Family Support Act

into its statutes, governing all matters of child support administration, including the establishment of a support order, modifications of support orders and collections.  In this instant case, and for exemplifying or "illustrating" the issues, citations of the UIFSA will be made from Colorado statute C.R.S. § 14-5-101 et seq.

58.  Definition of ***"Duty of Support"*** – Under C.R.S. § 14-5-102 (3), Uniform Interstate Family Support Act, a "Duty of Support" is defined to mean "an obligation imposed or imposable by law to provide support for a child, … including an unsatisfied obligation to provide support."  This definition is consistent with the UIFSA § 102 (3), nothing more nothing less, "whether or not that duty has been the subject of an order by a tribunal." (Source: "*UNIFORM INTERSTATE FAMILY SUPPORT ACT, Last Amended or Revised in 2001*," National Conference of Commissioners on Uniform State Laws, December 2001, Ibid. pp. 11 Section 102 Definitions Comment)

59.  Definition of ***"Support Order"*** – Under C.R.S. § 14-5-102 (23), a "Support Order" is defined to mean "a judgment, decree, order, or directive, … issued by a tribunal for the benefit of a child, … which *provides for monetary support, health care, arrearages, or reimbursement*, and may include related costs and fees, interest, income withholding, attorney's fees, and other relief."  Accordingly, C.R.S. § 14-5-102 (2) (23) is specific as to what constitutes child support order, which includes *a determination of the amount of obligation*, guidance for judicial discretion and enforcement.

**Addressing Occurrences of Competing Jurisdictions**

60.  The UIFSA is very clear on how competing jurisdictional disputes should be resolved.  The UIFSA Commissioners' intended for competing jurisdictional disputes be resolved based on "the

home State of the child," and not "first filing." This contention is uncontrovertibly supported by the following excerpt from the Commission's comments in the UIFSA:

> "Under the one-order system established by UIFSA … tribunals are expected to take an active role in seeking out information about support proceedings in other States concerning the same child. Depending on the circumstances, one of the other of two tribunals considering the same support obligation should decide to defer to the other. In 992 UIFSA took a significant departure from the approach adopted by the UCCJEA ("first filing"), by *choosing the "home State of the child" as the primary method for resolving competing jurisdictional disputes*, thereby adopting the choice of the federal PARENTAL KIDNAPPING PREVENTION ACT, 28 U.S.C. 1238A Section (C). Given the pre-emptive nature of the PKPA, and the possibility that custody and support will both be involved in some cases, the PKPA/UIFSA choice for resolving disputes between competing jurisdictional assertions was followed in 1997 by the decision of the Conference to replace the UCCJA with the UCCJEA. If the child has no home State, however, "first filing" will continue to control." *[emphasis added]*

(Source: "UNIFORM INTERSTATE FAMILY SUPPORT ACT, Last Amended or Revised in 2001," National Conference of Commissioners on Uniform State Laws, December 2001, Ibid. pp. 24 – Section 204 Comment).

## Colorado Revised Statutes (CRS) § 14-11-101

61. Colorado law under C.R.S. § 14-11-101 is clear there's *no judicial discretion* on questions of exclusive and continuing jurisdiction once a foreign decree enters Colorado:

> **"C.R.S. § 14-11-101 (1) – Foreign Decrees – How Handled.**
>
> (1) Upon the docketing in a court of competent jurisdiction in this state of exemplified copies of all written pleadings and court orders, judgments, and decrees in a case of divorce, separate maintenance, or annulment, or for support of minor children or spouse, or for a protection order or other court

order issued for the protection of a party or parties, or for a combination of the same entered in any court of competent jurisdiction in any other state or jurisdiction having reciprocal provisions for a like enforcement of orders, judgments, or decrees entered in the state of Colorado and upon obtaining jurisdiction by personal service of process as provided by the Colorado rules of civil procedure, said court in this state *shall have jurisdiction* over the subject matter and of the person in like manner *as if the original suit or action had been commenced in this state*, and is empowered to amend, modify, set aside, and make new orders as the court may find necessary and proper so as to do justice and equity to all parties to the action according to the public policy of this state, and has the same right, power, and authority to enter orders for temporary alimony, support money, and attorney fees as in similar actions originating in this state." [*emphasis added*]

(See also: _Clark_ 616 P2D 10 10 Colorado Court of Appeals, 1980; _Ness_ 759 P2D 844 Colorado Court of Appeals 1988; _Glickman v. Mesigh_ 200 Colorado 320 615 P2D 23, 1980; _Whitley_ 755 P2D 95 Colorado Court of Appeals, 1989).

### The Social Contract and Public Sector Honest Services

62. Defendant Denver District Court has a fiduciary duty to provide access, on an equal basis, to a fair and impartial tribunal for all litigants within its jurisdiction. *See: Corstvet v. Boger*, 757 F.2d 223 (10th Cir. 1985).

63. Defendants Denver District Court, Colorado DHS, Denver County, and Denver DHS-CSS each has a fiduciary duty to provide the people equal access to and equal treatment by its courts and public welfare agencies administering Title IV-D services for all qualified individuals. Defendants are required to comply with and adhere to all state and federal statutes, including C.R.S. § 14-11-101; and federal guidelines relevant to Title IV-D services, as embodied in the UIFSA and 42 U.S.C. §§ 651-659, and related state statutes.

64. For providing these administrative services, the states of Illinois and Colorado receive federal funding (both federal incentive payments and administrative reimbursements – see 42 USC §§ 655, 658) through the Title IV-D Program administered under the Social Security Act, and '*Personal Responsibility and Work Opportunity Reconciliation Act of 1996*'; and the states disburse these funds to its municipal entities Lake County, 19th Judicial Circuit Court, Denver District Court, Colorado DHS, Denver County and Denver DHS-CSS to support and finance their operations.

65. By receiving federal funds for the Federal Child Support Enforcement program, the states and their municipal entities waived state immunity under Section 5 of the Fourteenth Amendment (§5 Enforcement Clause), and under 42 U.S.C. § 2000d-7; and are liable for discrimination and federal rights violations against resident citizens whenever Title IV-D services are involved.

### Federal and State Obligations Not Met Under the Social Contract

66. On November 9, 2012 Plaintiff was assigned a "Duty of Support" by Illinois 19th Judicial Circuit Court; by June 2013 Plaintiff, Defendant Rebecca and the couple's minor child were residents of Colorado, with Colorado the home state of the minor child. By late August 2013, the Illinois case was docketed in Colorado pursuant to C.R.S. § 14-11-101, and on or around mid-October 2013 Plaintiff filed his first of several motions to establish a "Support Order" with Colorado Defendant Denver District Court, pursuant to federal UIFSA guidelines and state civil procedures and statutes.

67. Subsequently, the relevant federal and state statutes, obligations and guidelines not met and equal protection of law denied to Plaintiff, ostensibly include: C.R.S. § 14-11-101(1), and Title IV of the Social Security Act as reflected in Parts A and D, or 42 U.S.C. §§ 651-669.

1

2   **Undisclosed Conflicts of Interest**

3   68. As noted in defendant Akins' remarks on the record to Judge Starrs, at the time of Plaintiff's

4   state litigation, Illinois and Colorado enforced different formulas in establishing court-ordered

5   child support; Illinois employs a "single-payor, percent of income" formula, while Colorado

6   employs a "shared income, percent of residential custody" formula. Both states may also impute

7   an obligor's income at the discretion of the presiding judge if the judge believes the obligor can

8   earn more, but isn't.

9   69. Illinois, 19th Judicial Circuit Court, defendants Colorado DHS, Denver DHS-CSS and

10  defendant Denver District Court never disclosed to Plaintiff this conflict of interest.

11  70. The transcript and court records from both states show conflicting justifications being the

12  reasoning and basis for the December 6, 2013 minute-order to split jurisdiction. On May 22, 2015,

13  the Illinois Appellate Court, 2nd District, affirmed Defendant 19th Judicial Circuit Court's actions,

14  citing among its reasons as being "*the Illinois court had waited for the Colorado court to take*

15  *jurisdiction, [but] the Colorado court declined to take jurisdiction over the child support issue.*"

16  However, Defendant Denver District Court's December 6, 2013 minute-order memorialized and

17  recorded Illinois'19th Judicial Circuit Court's "*demand to retain jurisdiction over the matter of*

18  *child support determination.*" It appears that Defendant Denver District Court under Judge Starrs

19  acquiesced to Illinois' 19th Judicial Circuit Court's demand issued by Judge Johnson. Both

20  "justifications" for the December 6, 2013 minute-order to split jurisdiction nonetheless contravene

21  Colorado's C.R.S. §14-11-101 (1) et seq. and Title 14 C.R.S. Article 5 – UIFSA, as well as

22  Congress' UIFSA Guidelines to States, which lawfully places jurisdiction with the "home state"

23  of the minor child when jurisdiction is contested due to simultaneous proceedings in two states.

24

# CAUSES OF ACTION

## COUNT 1 – 5th AMENDMENT VIOLATIONS FROM THE PUBLIC TAKING OF PROPERTY WITHOUT JUST COMPENSATION (42 U.S.C. § 1983; C.R.S. § 13-80-102)

### Defendants

71. Plaintiff alleges 5th Amendment violations by the following state defendants: Denver District Court, Colorado DHS, Denver County, and Denver DHS-CSS, each as "persons" within the meaning of 42 U.S.C. § 1983 acting on state policies, customs and practices.

72. Plaintiff seeks compensation from defendants Denver District Court, Colorado DHS, Denver County, and Denver DHS-CSS in an inverse condemnation action.  In its general use, inverse condemnation describes a circumstance where a government entity has taken private property but failed to compensate the private owner as required by the 5th Amendment of the federal constitution.  While typically used in the realm of real-estate properties, the principle extends to all property, including personal savings and retirement assets, income and wages which are individually owned.

### Facts and Argument

73. It is long held that an inverse condemnation suit is legally and practically distinct from the originating state trial where the condemnation was adjudicated. *See Monterey v. Del Monte Dunes at Monterey, Ltd.* (1999) 526 U.S. 687, 702, 143 L.Ed.2d 882, 119 S. Ct. 1624 (1999).

74. In this instant case, as is typical when the government takes property without initiating condemnation proceedings, the government has shifted to Plaintiff, as rightful owner, the burden to discover the encroachment and to take affirmative action to recover just compensation. *See United States v. Clarke*, 445 U.S. 253, 257 (1980).

**Taking versus Penalty**

75. The Title IV program, specifically Parts A and D, was created by Congress and administered by the federal government to specifically address the circumstances of the "absent, noncustodial parent," or FNCP. The FNCP is a quasi-criminal class of parent who has willfully abandoned her/his parental obligations and duties to the child. [See ¶¶ 34-45]

76. Plaintiff was never found to have abandoned his child, nor charged with a violation of any laws that would in any way remove or diminish his parental rights and create a financial obligation under the federal definition of "absent, noncustodial parent", not in the Illinois proceedings under case no. 11-D-1102 nor in the Colorado proceedings under case no. 13-DR-1684, nor in any other court of competent jurisdiction.

77. Plaintiff further questions the state of Colorado's exercise of parens patriae power through its political subdivisions and municipal entities absent any finding of unfitness, abandonment or neglect.

78. Absent a conviction of a criminal act, or statutory violation which merits punitive damages or penalties, any taking of Plaintiff's property by the government for public use is protected by the 5th Amendment's just compensation clause.

**Public Use of Child Support Obligations**

79. All states participating in the Title IV programs receive federal administrative and incentive payments tied to the performance of its IV-D units (*see* 42 U.S.C. §§ 654(7), 658(a)). For Colorado, these units are defendant Colorado DHS, Denver DHS-CSS, Denver District Court. Performance metrics from which are determined the amount of federal dollars disbursed to the states are tied directly to the dollar amounts of the actual child and spousal support obligations.

1

2   Congress intended that these federal administrative and incentive payments to the states be for

3   public use with the public benefit in mind, to "reduce waste and improve the efficient use of

4   welfare expenditures." [*see* ¶ 34]

5       80. On September 28th 2015, defendant Denver District Court under Judge Goldberg granted

6   the registration and enforcement of an Illinois support order against Plaintiff, by the state of

7   Colorado.

8       81. On October 31st 2015, Colorado's Family Support Registry (defendant Colorado DHS)

9   issued an Obligor IV-D New FSR Account Notice to Plaintiff, for FSR account no. 13495999,

10  assigning enforcement to defendant Denver DHS-CSS.

11      82. Garnishment of Plaintiff's wages commenced in March 2016 by defendants Colorado

12  DHS, Denver DHS-CSS and Denver County.

13  **Plaintiff's Injuries and the Amount of Property Seized for Public Use**

14      83. Under Title IV-D, the amount from a support obligation used to determine eligibility for

15  federal administrative and incentive payments is the entire amount of the obligor's support

16  obligation, which includes any existing arrearages beyond the cumulative obligation.   For

17  calculating federal incentive payments, these are further delineated according to the metrics used

18  in the following way: a) the amount of the initial order created; b) the amount due each month or

19  payment period; and c) accumulated arrearages arising from the order.

20      84. Plaintiff's lifetime value for the existing child support obligation is approximately

21  $243,600 USD; current arrearages is approaching $80,000 USD and accruing, with the amount

22  compounding at an annual rate of 12% interest on the outstanding balance; the monthly amount

23  due is approximately $1,450 USD.

24

85. While unconfirmed, federal incentive payments are alleged to range between $0.60 USD to $2.00 USD for every eligible $1.00 USD of support owed for each qualifying category used to calculate these incentives.   This represents a substantial pecuniary "public use" benefit to defendants Colorado DHS, Denver DHS-CSS, Denver District Court and Denver County from the taking of Plaintiff's wages and retirement savings.

86. WHEREFORE, Plaintiff now seeks enforcement of his 5th Amendment right to be compensated for all property taken under the guise of child support to enable defendants Colorado DHS, Denver DHS-CSS, Denver District Court and Denver County local rule customs and practices of collecting federal payments under the Title IV-D programs.   Plaintiff seeks compensation under the 5th Amendment's just compensation clause for his property taken by defendants Colorado DHS, Denver DHS-CSS, Denver District Court and Denver County, in the amount of no less than $95,000 USD plus any other equitable relief determined at trial by jury before this Honorable Court.

## COUNT 2 – CIVIL VIOLATIONS OF 18 U.S.C. § 1962(c)

### Defendants

87. Plaintiff alleges civil violations of 18 U.S.C. § 1962(c) by the following defendants, individually and collectively:

    i)    Defendant Rebecca for acts and liabilities under 18 U.S.C. § 1584; 18 U.S.C. § 1589(b); 18 U.S.C. § 1951; 18 U.S.C. § 1952; 18 U.S.C. §§ 1341, 1343.

    ii)    Defendant R.M. Murray for acts and liabilities under 18 U.S.C. § 1584; 18 U.S.C. § 1589(b); 18 U.S.C. § 1951; 18 U.S.C. § 1952;

    iii)    Defendant D. Murray for acts and liabilities under 18 U.S.C. § 1584; 18 U.S.C. § 1589(b); 18 U.S.C. § 1951; 18 U.S.C. § 1952;

iv)   Defendant Jensen for acts and liabilities under 18 U.S.C. § 1584; 18 U.S.C. § 1589(b); 18 U.S.C. § 1951; 18 U.S.C. § 1952;

v)   Defendant Ridings for acts and liabilities under 720 ILCS 5/32-4e; 720 ILCS 5/33-1; 18 U.S.C. § 1584; 18 U.S.C. § 1589(b); 18 U.S.C. § 1951; 18 U.S.C. § 1952; 18 U.S.C. §§ 1341, 1343.

vi)   Defendant Akins for acts and liabilities under C.R.S. § 18-8-306; 18 U.S.C. § 1584; 18 U.S.C. § 1589(b); 18 U.S.C. § 1951; 18 U.S.C. §§ 1341, 1343.

vii)   Defendant Spiegle for acts and liabilities under 18 U.S.C. § 1951; 18 U.S.C. §§ 1341, 1343.

viii)   Defendant KRV PC for acts and liabilities under 18 U.S.C. § 1341, 1343.

ix)   Defendant SPAL PC for acts and liabilities under 18 U.S.C. § 1951; 18 U.S.C. § 1341, 1343.

### Defendants Engaged in and Affected Interstate Commerce.

88.   The nexus with interstate commerce is overwhelmingly supported by the facts and events of this case, specifically, in *United States v. Bongiorno*, 106 F.3d 1027, 1032 (1st Cir. 1997), it was held that "state-court-imposed child support orders are 'functionally equivalent to interstate contracts.'" Furthermore, Colorado Defendant Rebecca, residing in Colorado, with material and financial support from Colorado Defendants R.M. Murray, D. Murray and Jensen, engaged and paid for the services of Illinois attorneys Ridings, KRV PC, and Colorado Defendants Akins, and SPAL PC to procure a state-court-imposed child support order from the tribunal in Illinois, then to have it transferred to Colorado for enforcement.

89.   The actions of Defendants' Association-in-Fact and the Enterprise's operations directly affected interstate commerce, as transfer payments were made over wire from Plaintiff's employer

1

2   and bank accounts in Wisconsin, Colorado, Illinois and New York, and the debt instrument that is

3   serviced by these transactions is a court-imposed order, functionally the equivalent of an interstate

4   contract.

5   <u>**Other Wrongdoers**</u>

6   90.   Plaintiff further alleges that additional wrongdoers were involved, with several presumably

7   protected by judicial immunity.   Plaintiff invokes F.R.Cv.P. 20, reserving his right to permissive

8   joinder of parties upon these wrongdoers, if warranted, as defendants in this Complaint.   These

9   individuals are:

10       i)   David Finn, Psy.D. for acts and liabilities for his involvement as an agent

11           employed by Defendants Rebecca and Ridings, for interstate travel and

12           commerce in aid of racketeering, fraudulent misrepresentation and

        obstruction of justice;

13       ii)   Christina Ivashchenko for acts and liabilities while employed by KRV PC and

14           acting on behalf of Defendants Ridings and Rebecca, for her involvement in

15           the establishment of the Illinois "Uniform Support Order" of February 18,

16           2014, obstruction of justice, due process, tortuous interference against

        Plaintiff's business relations, and aiding the violation of statutes governing an

17           interstate commercial debt;

18       iii)   George Kililis, acting on behalf of KRV PC and Defendants Rebecca and

19           Ridings, for his involvement in the support of racketeering activities,

        fraudulent misrepresentation and obstruction of justice.

20   <u>**The Victim**</u>

21   91.   The victim is your Plaintiff; Plaintiff discovered he was victimized when notified of a

22   judgment entered on November 9, 2012; this judgment was *affirmed and effected* on April 12,

23

24

2013 by the STATE OF ILLINOIS APPELLATE COURT SECOND DISTRICT and Plaintiff's various injuries began *accruing* retroactive to November 9, 2012 and continuing thereafter.

92. The victim, your Plaintiff, was further injured on February 18, 2014 when Defendants Rebecca, Ridings and Akins, financed by Defendants R.M. Murray, D. Murray and Jensen, with KRV PC and SPAL PC, conspired and successfully obtained a court-imposed child-support order the equivalent of an interstate commercial debt obligation, for monetary gain through the forceful seizure of Plaintiff's income, and denied Plaintiff his intangible rights to honest services. This new injury was proximately caused by the November 9, 2012 judgment, and the preceding and continuing acts by Defendants, creating a pattern of racketeering.

93. Next, the victim, your Plaintiff, was further injured separately on or around November 22, 2014 when Defendants Rebecca, Akins and Spiegle conspired and created a wholly separate debt obligation on Plaintiff through force and coercion. This new injury was proximately caused by the November 9, 2012 judgment and continuing acts of racketeering by Defendants while operating within the Enterprise as an Association in Fact.

94. The victim, your Plaintiff, summarizes his injuries below. *See* ¶ 149.

### The Enterprise

95. In this instant case, the "Enterprise" and its collusive practices have been defined and described by many investigators, including social scientists and researchers, social commentators, policy analysts, and investigative journalists. Among some of the seminal works describing the Enterprise are those of: i) J. Sorge, "DivorceCorp", ISBN-10: 0991283104, ISBN-13: 978-0991283101, DC Book LLC (2014), 221 pages, www.divorcecorp.com; ii) S. Baskerville, "Taken Into Custody: The War Against Fathers, Marriage, and the Family", ISBN-10 1581825943, ISBN-

13: 978-1581825947, Cumberland House Publishing (Sept. 24, 2007), 368 pages; and J. Parejko, "Stolen Vows: The Illusion of No-Fault Divorce and the Rise of the American Divorce Industry", ISBN-10: 1591960223, ISBN-13: 978-1591960225, InstantPublisher (May 2002), 180 pages.

96. The "Enterprise" constituency consists of: (a) the Domestic Relations court judges and magistrates of all 50 states and territories within the United States who preside over the forum courts managing proceeding in the courtrooms and rendering legally binding judgments and orders; (b) the various state and municipal entities and political subdivisions of government administering the social services and institutions such as child protective services, departments of revenue, departments of transportation, law enforcement, welfare and rehabilitation programs and in this particular case, the Federal Title IV programs under the federal Social Security Act administered by the state and local departments of human services, and the agencies enforcing obligations; (c) various professionals, such as Colorado's Child and Family Investigators (*hereinafter*, "CFI") and Parental Responsibilities Evaluators (*hereinafter*, "PRE"), mediators, and their counterparts in the other 49 state and territorial court systems of the United States, involved in domestic relations and abuse cases, and dependency and neglect litigation before the courts; (d) attorneys and lawyers practicing privately in family, juvenile, probate and domestic relations law, representing litigants or serving as Guardian Ad Litems throughout the Domestic Relations and chancery courts of all 50 states and territories within the United States; (e) professional organizations, guilds and associations such as the Association of Family and Conciliation Courts (*hereinafter*, "AFCC"), the American Academy of Matrimonial Lawyers (*hereinafter*, "AAML"), the national and state BAR associations and their local Family Law subdivisions/chapters, the National Center for State Courts, and the State Justice Institute to name a few, whose membership

compositions include judges, lawyers and attorneys, state legislators, professors of law and academics, and professionals from allied fields such as psychology who are integral to these state courts effecting legally binding outcomes on litigants, whose purpose is to train judges, magistrates and attorneys, and allied professionals in "best" and common practices, as well as lobbying legislators for favorable laws and institutionalizing favored social policies.

97. The Enterprise operates in the Domestic Relations courts of all 50 states and territories within the United States; it engages in establishing and settling disputes corresponding to marriage dissolution, child custody, alimony and other support, guardianship and matters of probate and estate disputes, parenting decisions between divorced or separated parents, and matters of equity.

98. In this instant case, the Enterprise engages in marriage dissolution proceedings, assignment of post-decree obligations such as alimony, child support and distribution of marital assets, child support administration, including the collection, distribution and use of federal incentive and reimbursement payments paid to states for their performance levels concerning: i) the establishment of child support orders, ii) the collections on current child support due, and iii) the collections on child support arrearages. In this function, the Enterprise operates in all 50 states and territories, as well as internationally when pursuant to The Hague Convention, and is engaged in interstate commerce as support obligations are commercial debt obligations regulated under the federal guidelines of the UIFSA, 42 U.S.C. §§ 654, 658, 666 and other federal statutes and such obligations issued by each state enjoy the full faith and credit among the other states.

99. Altogether, the Enterprise may be an otherwise legitimate operation; however, its constituent members, while somewhat regulated by professional codes of conduct and/or oaths of office in some instances, are to an extent free to interpret the boundaries of ethics in what has

traditionally been promoted and reputed as an adversarial system of litigation – where "win at all cost" is not unheard of and secretly admired.

<strong><u>Defendants' "Association-in-Fact"</u></strong>

100. Relevant to this pleading is the Defendants' "Association-in-Fact" enterprise, comprised of Defendants Rebecca, R.M. Murray, D. Murray, Jensen, Ridings, Akins, and Spiegle; this Association-in-Fact enterprise was further supported intermittently by Defendants KRV PC and SPAL PC.

**Purpose**

1) Defendants' Association-in-Fact formed for the purposes of:

    a)  monetary enrichment of all members by any means including but not limited to corrupt persuasion and influence of public servants within the Enterprise, with defendants Rebecca, R. Murray, D. Murray and Jensen being the primary beneficiaries, and constituents Ridings, Akins, and Spiegle indirectly through Defendant Rebecca's patronage; enrichment is derived from Plaintiff's income, business and property, and attained through the transfer of wealth and assets by the otherwise legitimate operations of the Enterprise under court-imposed financial and material obligations created through court orders, enforced through otherwise legitimate state and federal laws by municipal entities such as the Colorado Department of Human Services and Denver County Department of Human Services;

    b)  to further its primary purpose of monetary enrichment, subjecting Plaintiff to parentectomy by all available means through the operations of the Enterprise, including exploitation of the Enterprise's operations, activities and functions in

the administration of child support matters and other forms of legal abuse through manufactured controversies.

**Defendants' Relationship and Individual Roles**

1) Defendants' relationship is fluid, and the composition and existence of their "Association in Fact" is much like musicians in an orchestra, band or quartet – organized for a specific courtroom performance, and always including at least one private party beneficiary (Defendant Rebecca), who is also an active patron (litigant), and where the "conductor" or "composer" may be one or more of the engaged Enterprise constituents, usually the lawyers and attorneys (defendants Akins, Ridings, SPAL PC and/or KRV PC), but occasionally may be the CFI or PRE (defendant Spiegle), and GAL, all employed for their technical "expertise," knowledge and skills on how to deal within the Enterprise's forum, the courtroom, for the performance on hand.

2) In this instant case, Defendants' Association-in-Fact formed at the pleasure and consent of Defendant Rebecca, the primary patron and beneficiary of its collusive practices, with material aid and support from Defendants R.M. Murray, D. Murray and Jensen, and reliance on the technical knowledge of the workings of the Enterprise, its activities and related expertise of Defendants Ridings, Akins, and Spiegle who individually and collectively, knowingly, willfully and intentionally, acted outside of professional standards and acceptable practices in an orchestrated manner to manage and operate within the Enterprise on behalf of Defendant Rebecca and themselves to implement the Association-in-Fact's various artifices to defraud. Additional support was provided intermittently by Defendants KRV PC and SPAL PC. Specifically, the following summarize the known and presumed role of each defendant in this Association-in-Fact:

i) Defendant Rebecca: at times directed and caused the acts of other defendants such as Akins, Ridings, Spiegle, KRV PC, and SPAL PC; at other times manipulated and influenced the decisions of other defendants and wrongdoers including Akins, Ridings, KRV PC, SPAL PC, Spiegle, R. Murray, D. Murray and Jensen. Relations to the Enterprise is through association only.

ii) Defendants Akins, Ridings, KRV PC and SPAL PC: at all times directed, managed, and orchestrated the operations of the Association-in-Fact, as well as manipulated and influenced the proceedings in the Enterprise's forum courtrooms and municipal entities administering the Title IV programs; at other times directed and caused the behaviors of defendants Rebecca, R. Murray, D. Murray, Jensen and Spiegle. Relations to the Enterprise is through both association and direct inclusion as one of the many constituents operating within the business of the Enterprise.

iii) Defendants R. Murray, D. Murray and Jensen: at times manipulated and influenced the proceedings in the Enterprise's forum courtrooms, through testimony, and directly financed the operations of the Association-in-Fact to enable defendants to implement their artifices to defraud. Relations with the Enterprise is through association.

iv) Defendant Spiegle: at all times acted to influence the Enterprise's court proceedings to favor himself, aiding and abetting the Association-in-Fact's artifices to defraud. Relations to the Enterprise is both through association and direct inclusion as one of the many constituents operating within the business of the Enterprise.

**Duration of Existence and Continuity**

1) Defendants' Association-in-Fact exists as and when necessary, to pursue and to accomplish its various purposes in the Enterprise's forum, the courtroom.

2) Because the federal incentives paid to states under Title IV programs supplement a states' operating budget for its courts and human services operations, an ongoing and continuing threat of repeated and future criminal activities exist, as the Association-in-Fact, by its very nature and fluid composition of unsuspecting litigants, may constitute whenever child custody is in dispute, and child or spousal support is in controversy, ensnarling other victims besides this Plaintiff through similar predicate acts of racketeering, including but not limited to bribery, attempts to influence a public servant, interfering with the duties of a judicial officer, human trafficking for involuntary servitude, honest services fraud, wire and mail fraud. This is particularly true of the attorneys and allied professionals engaged in the daily operations of the Enterprise; such ongoing unlawful activities whose scope and persistence pose a special threat to social well-being, arguably remain the regular way business is conducted within some circles of loosely affiliated, unethical Enterprise constituents. Plaintiff is aware of and acquainted with other victims within the state of Colorado, the state of Illinois, the federal 10th Circuit and other federal districts across the country, who are prepared to testify of the abuses and corruption carried out by various Association-in-Fact constituents within the otherwise legitimate operations of the Enterprise.

## **Multiple Artifices to Defraud**

101. Defendants, through its Association-in-Fact, employed at least two schemes, one of which used "kickbacks" to coerce wrongdoers within the Enterprise to further Defendants' purposes, designed to have the Enterprise induce and enforce the transfer of Plaintiff's property to Defendants Rebecca, Ridings, Akins, and Spiegle.

**First Scheme.**

102. The first scheme employs a pattern of intentional and willful acts, the conduct of which consists of: a) obstructing justice through the use of intentional and fraudulent misrepresentations and omissions by witnesses and litigants directed at the Enterprise's operations such as custody evaluations, contested divorces and settlements, and allegations of domestic abuse; b) churning litigation with unnecessary court pleadings causing Plaintiff (victims) emotional and financial distress in an effort to secure a "win" by attrition, financial and/or emotional exhaustion; and c) the use of "expert witnesses" to further a false or tailored narrative and to manufacture controversies directed at the Enterprise's operations to induce an outcome favorable to Defendants resulting in the: d) redistribution of Plaintiff's (victims') property to Defendants by any means achievable, including the exploitation and use of the Enterprise's legitimate operations under color of law; e) depleting by all means available the Plaintiff's (victims') financial resources and ability to mount a legal defense by coercing the Enterprise to induce peonage and involuntary servitude on the Plaintiff (victims) through court-ordered financial obligations and debts; (f) corrupt persuasion, and (g) using the mail and wire to complete that purpose.

**Second Scheme.**

103. The second scheme aimed to manipulate the Enterprise into issuing an amount of court-ordered child support that would further the purposes of Defendants' Association-in-Fact for personal enrichment through seizure of Plaintiff's (victims') business and property, financially crippling Plaintiff, placing Plaintiff in a condition of involuntary servitude, and exposing Plaintiff to civil violations carrying a potential sentence or penalty of criminal incarceration.

104. This second scheme involves forum shopping to commit *statutory arbitrage*, whereby differences in the statutory formulas used to establish dollar amounts of child support are exploited to maximize the amount of child support imposed on Plaintiff. For the second scheme to succeed, Defendants' Association-in-Fact, absent Spiegle, would require the coercion of key public officials and judicial officers such as judges and magistrates, to improperly apply discretion.

105. For example, in August 2013, Defendants' Association-in-Fact, absent Spiegle, through Defendant Ridings and KRV PC, presented such a scheme to Illinois Judge Charles D. Johnson. On record as memorialized in the court transcripts, defendant Ridings requested of Illinois 19th Judicial Circuit Court under Judge Johnson:

> RIDINGS: "Judge, could we enter and continue it at least so that by the time it gets to Colorado *the arrearages* can be calculated?"
>
> COURT: "Yeah, that's fine." (***Emphasis added***)

106. This request directly contravenes federal Title IV and UIFSA guidelines to state courts regarding the speedy resolution and issuance of child support orders. Defendant Ridings "bent of mind" and motivation to delay the issuance of a Uniform Support Order and suggesting this to the Illinois court, points directly to three factors of influence that may bias a court's decision to align with the Association-in-Fact's purposes, these being: a) in the context of Plaintiff's circumstances, Illinois' statutory single-payor formula is more favorable than Colorado's dual-income formula, and will potentially generate a greater amount of financial obligation imposed on Plaintiff; b) by delaying the issuance of a support order, Plaintiff is prevented from seeking an immediate modification in Denver, even before jurisdiction is transferred to Colorado, as the court order permits such a modification when personal circumstances allow, such as the Plaintiff having just

relocated to Denver – this ties also to a pending modification in residential time to restore equal parenting time once both parents are in the same state again, which favors Plaintiff under Colorado's statutory formulas for child support determination; and c) the combined establishment of a support obligation and the instantaneous creation of arrearages under the Illinois formula would qualify Illinois to receive maximum federal incentives under the Title IV-D program without necessarily holding Illinois' Dept. of Child and Family Services (DCFS) to administering the order if the order is subsequently transferred and registered in Colorado. This last factor may have pecuniary relevance on the court, and defendant Ridings' request for a continuance served as a "dog whistle" to alert Judge Johnson to this factor, especially when her suggestion specifically pointed to "arrearages" arising from such a delay.

107. This is further support by the fact that at the time, concurrent litigation was about to get underway in Colorado to modify parenting time back to 50/50 between Plaintiff and defendant Rebecca. Legal custody has always been equal and joint; Plaintiff has never been found by any court of competent jurisdiction to be an unfit, non-custodial and absent parent. With an Illinois support order, Plaintiff is imposed with 100% of the child support obligation while enjoying only 50% of residential parenting time.

108. On several occasions from August through November 2013, Defendants' Association-in-Fact, absent Spiegle, through Defendants Rebecca, Akins and SPAL, PC, brought this same scheme to defraud before Colorado Judge Elizabeth A. Starrs.

109. When Plaintiff petitioned defendant Denver District Court under Judge Starrs for an originating uniform child support order as permitted under the UIFSA and C.R.S. 14-5-401, defendants Rebecca, Akins and SPAL PC immediately opposed.

1

2     110. Defendant Akins openly stated on the court record to Judge Starrs, suggesting and

3 insinuating the statutory formulas used by Colorado to determine child support amounts are

4 deficient, implying that somehow defendant Rebecca would be disadvantaged. This is nothing

5 more than a "dog whistle" statement to alert the court to the discrepancies and differences between

6 Illinois' single-payor formulas and Colorado's dual-income formulas – completely ignoring

7 guidelines established in state and federal statutes addressing the matter of exclusive continuing

8 jurisdiction under UIFSA, which is based on the home-state of the minor child, which is Colorado

9 as previously acknowledged on the court record even by Judge Starrs.

10 **Use of Kickbacks in 2nd Scheme.**

11     111. Where the coercion of public officials and public services fraud is alleged, Plaintiff cites

12 the construct of the kickback scheme as one which involves a public official (judge) awarding a

13 contract (decision/judgment/court order) to a contractor (Defendant Rebecca/Association-in-Fact)

14 in exchange for the contractor sharing its commissions (judgment award/federal incentive

15 payments) with entities in which the official (judge/other public entity) has an interest

16 (direct/indirect).

17     112. Here, the "public officials" in the kickback scheme are Illinois Judge Johnson and

18 Colorado Judge Starrs, acting under the protection of judicial immunity. The "contractor" in the

19 scheme is Defendants' Association-in-Fact, absent Spiegle, operating in the state courts of Illinois

20 and Colorado seeking an award of judgment for a commercial interstate contract for child support

21 payments. In exchange for a favorable judgment ("award of maximum child support"), Defendant

22 Rebecca ("contractor") would share her "commissions" received in monthly child support

23 payments and collected arrearages with Defendants Colorado DHS, Denver County, and Denver

24

District Court (other entities), *see* 42 U.S.C. § 658 (a) federal Title IV-D payments to states pertaining to court-ordered child support administration, in which wrongdoers Judge Johnson and Judge Starrs ("public officials") likewise share an interest (e.g. pensions, salaries, paid benefits and other state payments/disbursements to the court system).

113. In this instant case, this scheme to defraud is enabled per 42 U.S.C. § 654(7), *State plan for child and spousal support* (current 2014 version), for the State to participate in the Title IV programs, it must:

> (7) provide for entering into ***cooperative arrangements with appropriate courts*** and law enforcement officials …
>
> (A) to assist the agency administering the plan, including the entering into of ***financial arrangements with such courts*** and officials in order ***to assure optimum results*** under such program, and
>
> (B) with respect to any other matters of common concern to such courts or officials and the agency administering the plan. (***Emphasis added***)

114. Defendants' Association-in-Fact exploited the Enterprise's inherent conflict of interest and the Enterprise's use (abuse) of judicial discretion protected by judicial immunities. Ultimately, it is the federal government, tax payors and the Plaintiff who are victimized by Defendants' scheme for fraudulent enrichment.

### **Pattern and Conduct**

#### Those Pursuant to 720 ILCS 5/33G

**Civil Violations of 720 ILCS 5/32-4e – Interfering with the Duties of a Judicial Officer**

1st Instance

1

2    115. Around August 2012 Defendants Ridings and KRV PC sent a court subpoena to

3    ECHELON CORPORATION in California, Plaintiff's former employer, demanding Plaintiff's

4    work history, and the nature of his termination of employment. ECHELON responded with an

5    affidavit stating that Plaintiff's termination of employment was 'involuntary,' consistent with

6    Plaintiff's testimony on the witness stand during trial.

7    116. After testimony and presentment of evidence at trial, on or around September 4, 2012 in

8    written closing arguments Defendant Ridings intentionally misrepresented facts already in her

9    possession about Plaintiff's loss of employment at ECHELON, falsely accusing Plaintiff of

10   "sabotaging" his employment. For the purpose of calculating child support amounts under Illinois

11   statute, Plaintiff's imputable income was approaching $155,000.00 USD, whereas Defendant

12   Rebecca's income was significantly less.

13   117. On November 9, 2012, Judge Brodsky entered "Judgment for Dissolution of Marriage"

14   granting joint-custody, but designating Plaintiff the "non-primary caregiver" and Defendant

15   Rebecca the "primary caregiver." This ruling discounted the professional recommendations of Dr.

16   Mark Goldstein, the court-appointed custody evaluator, that the minor child should remain in

17   Illinois with Plaintiff, the court-appointed GAL Del Re reversing his recommendation on custody

18   after learning Defendant Rebecca had perjured herself, and circumstantial evidence of conspiracy.

19   This ruling also assigned Plaintiff 100% of the child support burden, despite joint-custody.

20   118. Defendants Ridings and KRV PC, in submitting written closing arguments on case no. 11-

21   D-1102 to Illinois Judge Brodsky, corruptly endeavored to influence and impede Judge Brodsky's

22   ability to fairly adjudicate on the facts of the case by willfully, intentionally and fraudulently

23   misrepresenting evidence in their possession that was subpoenaed from ECHELON CORP;

24

Defendant Ridings knowingly used corrupt persuasion and misleading conduct against Plaintiff; and did so with the intent to deny Plaintiff any opportunity to refute defendants' false allegations in case no. 11-D-1102. Defendants Ridings and KRV PC knew this was material to providing Illinois Judge Brodsky a rationale to impose child support obligations upon Plaintiff, thereby offering the means to subsequently enable the benefits, promises and pecuniary compensation from federal Title IV payments to the State of Illinois [see ¶¶ 34-36, 47-48,105], as a form of "kickback." Furthermore, by intentionally suppressing Plaintiff's attorneys' ability to timely and properly present evidence at trial refuting Defendants' fraudulent misrepresentation, Defendants corruptly endeavored to influence, obstruct and impede the due administration of justice by officers of the court.

2nd Instance

119. In June 2013, upon learning Plaintiff established residency and citizenship in Colorado, Defendant Ridings intentionally reversed herself with Judge Johnson, seeking a delay in establishing the child support order, despite moving to enforce judgment. Defendant Ridings, an attorney practicing family law in Illinois, knew that once a child support order is issued, Plaintiff could take the order to Colorado to seek an immediate modification as permitted by the UIFSA on the justification a significant change in circumstances occurred as Plaintiff had just relocated to Colorado.

120. On or around August 18, 2013 Defendant Ridings on behalf of Defendant Rebecca, appeared before Illinois Judge Johnson at case no. 11-D-1102, corruptly endeavored to influence and induce Judge Johnson to delay proceedings solely to cause to accumulate an unspecified amount of child support arrearages by offering a means to enabling the benefits, promises and

pecuniary compensation from federal Title IV payments to the State of Illinois [*see* ¶¶ 34-36, 47-48,105], as a form of "kickback," in direct contravention of statutes and federal UIFSA guidelines.

121. On the record as memorialized in the court transcripts, Defendant Ridings requested of Defendant 19th Judicial Circuit Court under Judge Johnson:

> RIDINGS: "*Judge, could we enter and continue it at least so that by the time it gets to Colorado **the arrearages** can be calculated?*"

and Judge Johnson (COURT) responded,

> "*Yeah, that's fine.*" [***emphasis added***]

122. Defendant Ridings knowingly used corrupt persuasion and misleading conduct to influence the court in the performance of its duties by offering indirect pecuniary compensation in the form of federal Title IV payments to the State of Illinois [*see* ¶¶ 105-107]; and did so with the intent to deny Plaintiff equal protection of the law and due process in case no. 11-DR-1102.

<u>Those Pursuant to C.R.S. § 18-17-101</u>

**Civil Violations of C.R.S. § 18-8-306 – Attempting to Influence a Public Servant**

<u>1st Instance</u>

123. On or around early November 2013 Defendants Akins and Rebecca, appearing before Colorado Judge Starrs at case no. 13-DR-1684 in Denver District Court, corruptly endeavored to influence and induce Judge Starrs, through implicit economic benefits to the State of Colorado and its municipal and political subdivisions, to ignore statute and relinquish lawful jurisdiction to a foreign tribunal, in direct contravention of statutes and federal UIFSA guidelines, by invoking the indirect pecuniary interests associated with federal incentive payments under Title IV-D as a form of "kickback".

124. Defendant Akins openly stated on the court record to Judge Starrs, suggesting and insinuating the statutory formulas used by Colorado to determine child support amounts are deficient, implying that somehow defendant Rebecca and Colorado's Title IV program would be disadvantaged.  This is nothing more than a "dog whistle" statement to alert the court to the discrepancies and differences between Illinois' single-payor formulas and Colorado's dual-income formulas – completely ignoring guidelines established in state and federal statutes addressing the matter of exclusive continuing jurisdiction under UIFSA, which is based on the home-state of the minor child.

<u>Those Pursuant to 18 U.S.C. § 1961</u>

**Acts and Liabilities Under 18 USC § 1584 – Involuntary Servitude**

<u>1st Instance</u>

125. At the close of 2013, Plaintiff's informed the Illinois court that the case legally entered Colorado jurisdiction on December 6, 2013 pursuant to C.R.S. § 14-11-101(1).

126. On or around February 18, 2014, Illinois Judge Johnson held an ex-Parte hearing with defendant KRV PC represented by Christina Ivaschenko to create a "Uniform Support Order", imputing the maximum income allowed under Illinois statutes based on Plaintiff's last reported salary from two years prior – despite and ignoring Plaintiff's several more recent verified pleadings stating he is unemployed and seeking employment in Denver, where the Illinois court granted defendant Rebecca's request to relocate Plaintiff's child.

127. Illinois' 19th Judicial Circuit Court under Judge Johnson further set Plaintiff's child support arrearages to date back to June 2013, as Defendant Ridings and Rebecca requested during a hearing in August 2013 [*see* ¶ 175], imputing the maximum permitted under Illinois' statutory

formulas for calculating support, disregarding whether Plaintiff could have complied with such an ordered amount, then a lump sum of approximately $17,500 USD on February 18, 2014. Plaintiff contends Illinois' 19th Judicial Circuit Court under Judge Johnson intentionally and willfully acted with malice and malfeasance, abusing all available judicial discretion.

128. The child support order issued by Illinois' 19th Judicial Circuit Court instantly created arrearages, with compounding interest at 12% or more, and repeating obligations in an amount that statutorily permitted the state child support enforcement agency and law enforcement to immediately imprison the Plaintiff on criminal charges under 18 U.S.C. § 228, if determined to be in "willful non-compliance," had Plaintiff at the time not been residing with his child in the same state of Colorado.

129. Defendant Denver District Court remained silent throughout on Plaintiff's *Motion to Reconsider* the December 6, 2013 minute order granting Illinois retain jurisdiction on this single issue despite the case having lawfully entered Colorado's jurisdiction pursuant to C.R.S. § 14-11-101(1). Furthermore, defendant Akins argued against Plaintiff's assertions that a violation of statute occurred, specifically C.R.S. § 14-11-101(1); Akins intentionally obfuscating the issue by insisting that Judges Starrs and Johnson conferred, suggesting on record the courts know more about the law than Plaintiff, and the matter closed by *res judicata* on a minute order.

130. Thereafter, defendant Denver District Court under Judge Ross B.H. Buchanan directed Plaintiff, on record, to "pick which horse to ride" and choose between one of two options: (a) challenging the Illinois child support order in Illinois, or (b) *accepting* the Illinois order and seek a modification in Colorado, "but not both." (*See also* Rule 2.11: Disqualification, Colorado Code

1

2     of Judicial Conduct (2010)).  Defendant Denver District Court again ignored Plaintiff's *Motion to*

3     *Reconsider*.

4         131. The court record will further show Judges Starrs and Buchanan knew that as far back as

5     December 2013 that Plaintiff was unemployed and seeking employment, and never considered

6     whether Plaintiff could comply with the court-ordered support amount of the Illinois issued order.

7     Despite his circumstances, at no time did Plaintiff receive public assistance or welfare, nor did he

8     abandon care or custody of the minor child.

9         132. On or around February 18, 2014 Defendants' Association-in-Fact primarily consisting of

10    defendants Rebecca, Ridings, Akins, with support and financed in part by defendants R. Murray,

11    D. Murray and Jensen, through its scheme to defraud, and assisted by the Enterprise, knowingly

12    and intentionally caused Plaintiff to incur an involuntary debt in the form of child support

13    arrearages, holding Plaintiff in involuntary servitude under the threat of legal coercion, to be

14    administered and enforced through the Enterprise by defendants Colorado's DHS and Denver

15    DHS-CSS, to service the debt against his will, not once considering Plaintiff remains a fit parent

16    continuing to provide for the needs of his child, and was never found to be an "absent, non-

17    custodial parent" or FNCP by any court of competent jurisdiction.

18    **Acts and Liabilities Under 18 USC § 1589 (b) – Forced Labor**

19        1st Instance

20        133. On October 31st 2015, Colorado's Family Support Registry (defendant Colorado DHS)

21    issued an Obligor IV-D New FSR Account Notice to Plaintiff, for FSR account no. 13495999,

22    assigning enforcement to defendant Denver DHS-CSS.

23

24                                    Page 48 of 68

1

134. Beginning in March 2016 defendant Rebecca, by and through the actions of Defendants' Association-in-Fact primarily consisting of defendants Rebecca, Akins, Ridings and financed in part by defendants R. Murray, D. Murray and Jensen, in manipulating the operations of the Enterprise, obtained the involuntary services of Plaintiff by way of acquiring Plaintiff's income through the garnishment authority of the Enterprise through its child support enforcement agencies, such that if Plaintiff does not perform he would suffer loss of liberty and potential incarceration under color of law and the legal process. Plaintiff was also subjected to the threat of license forfeiture for any delinquencies in service the court imposed debt obligation, and has already lost his privilege to hunt and fish within Colorado's state parks and rivers. Despite his circumstances, at no time did Plaintiff receive public assistance or welfare, nor did he abandon care or custody of the minor child.

**Acts and Liabilities Under 18 USC § 1951 – Extortion and Robbery**

Multiple Instances.

135. From March 2016 to the present, Defendants' Association-in-Fact, consisting of defendants Rebecca, Akins, Ridings, and Spiegle with material aid, support and financing from defendants R. Murray, D. Murray and Jensen, aided by Defendants SPAL PC, acted collectively and induced Plaintiff to unwillingly transfer to defendant Rebecca via defendant Akins and SPAL PC approximately $7,400 USD of his retirement savings, approximately $2,500 USD for unauthorized "professional services" performed by defendant Spiegle without Plaintiff's consent, approximately $2,500 USD in recurring monthly support obligation, and assigned a debt more than $70,000 USD that is accruing interest at 12% or more per annum payable to Defendant Rebecca through the Enterprise's operations managed by defendant Colorado DHS and Denver DHS-CSS.

Defendant Rebecca voluntarily and intentionally did so by extortion through the wrongful use of threatened force and fear provided by the Enterprise under color of law (e.g. loss of driver's license and other licenses, criminal incarceration for failure to pay or comply).

136. Defendant Rebecca's actions, together with the actions of Defendants' Association-in-Fact and the Enterprise directly affected interstate commerce, as transfer payments were made over wire from accounts in Wisconsin, Colorado, Illinois and New York, and the debt instrument being a court-imposed order is functionally the equivalent of an interstate contract (see *United States v. Bongiorno*, 106 F.3d 1027, 1032 (1st Cir. 1997)).  Plaintiff has unwillingly parted with at least $30,000 USD to-date, and faces continued threats of criminal incarceration for missed payments and outstanding arrearages exceeding $70,000 USD to-date, were Plaintiff unexpectedly required to seek employment requiring him to reside outside of Colorado.

**Acts and Liabilities Under 18 USC § 1952 – Interstate Travel in Aid of Racketeering**

At Least 1 Known Instance.

137. On or around late March or early April 2012 defendants Rebecca, R. Murray, D. Murray and Jensen in Colorado, with Defendants Ridings and KRV PC in Illinois, used the mail or wire, and hired David Finn, Psy.D. to travel on their behalf from Illinois to Colorado and back to facilitate the promotion of fraudulent misrepresentations to the Enterprise through the commissioning of an "environmental and psychological" assessment of the minor child in defendants' proposed Colorado domiciles and communities, and its suitability for the immediate relocation of Plaintiff's child to Colorado from Illinois; and after doing so Defendants Rebecca, Ridings and KRV PC presented the false narratives of David Finn, Psy.D. to deceive the Enterprise; and used the mail and wire to finance and manage their scheme to defraud.

138. Subsequently, in April 2012 David Finn, Psy.D. issued findings highly defamatory and critical of Plaintiff, recommending to Illinois Judge Brodsky the minor child be allowed to relocate permanently to Denver, Colorado with defendant Rebecca. Judge Brodsky stated on record that he found David Finn's testimony on the witness stand to be less than credible, and maintained equal custody for the term of dissolution and custody proceedings. David Finn was also asked to disclose his fees for "professional services" rendered, to which his response was more than $24,000. USD; this is also preserved in the record of court proceedings from case no. 11-D-1102.

**Acts and Liabilities Under 18 USC §§ 1341, 1343 – Honest Services, Mail and Wire Fraud**
    At Least 32 Instances.

139. Pursuant to Illinois statute 750 ILCS 5/505, Illinois' 19th Judicial Circuit Court assigned a "**Duty of Support**" *solely* to Plaintiff; Illinois Judge Brodsky deferred the establishment of a child support order for six-months or until Plaintiff secures employment, whichever being sooner.

140. 19th Judicial Circuit Court expressly noted its November 9, 2012 judgment was predicated on (proximately based on) Plaintiff's "voluntary" unemployment, falsely asserted by Defendants Ridings and KRV PC in Defendant Rebecca's written closing argument.

141. Throughout proceedings in Illinois, Defendants Rebecca, Ridings and KRV PC churned litigation by originating and initiating almost twice as many pleadings as Plaintiff, many frivolous and vexatious in nature, and employing "expert" witnesses the Illinois court found to be "incredible." Defending against these false allegations and vexatious tactics caused Plaintiff's litigation expenses to accumulate beyond 3-times those of Defendant Rebecca's, approaching $500,000. Despite Defendants' vicious attacks, at no point was Plaintiff found by the Illinois court to be an unfit parent, nor was he found to be an absent non-custodial parent.

142. Separately, in April 2014 Plaintiff moved Defendant Denver District Court to modify residential custody to restore the 50/50 custody in place during proceedings in Illinois. At trial, Defendants Rebecca, Akins, R.M. Murray, D. Murray, and Jensen again launched into a litigation campaign attacking Plaintiff in a concerted effort to deny Plaintiff his parental rights and relationship with his offspring. Defendants' motivation for such attacks rests with maximizing child support payments and had nothing to do with preserving the emotional well-being of the minor child, nor respecting Plaintiff's natural rights as a parent.

143. In September 2014, not even three months after Judge Buchanan restored Plaintiff's 50/50 residential custody, Defendants Rebecca and Akins, in ex-Parte communications with Judge Buchanan's clerk, and without prior conferral with Plaintiff, scheduled a telephone hearing to have the court impose "clinical counseling" for the minor child with Defendant Richard F. Spiegle, Psy.D, despite and after Plaintiff had withdrawn his parental consent regarding Defendant Spiegle due to valid concerns he'd expressed.

144. Plaintiff withdrew parental consent for visits with Defendant Richard F. Spiegle, Psy.D. for the following reasons: a) Plaintiff discovered that Defendants Rebecca and Akins were conspiring with Defendant Spiegle to create a false narrative before the tribunal, much as Defendants Rebecca and Ridings had with Dr. Finn in Illinois, in an artifice to defraud and manufacture a "custody crisis"; b) previously, Defendant Spiegle refused Plaintiff's request to clarify and describe his clinical protocols and targeted outcomes, to which Plaintiff was reluctant to proceed further with this out-of-network provider; and c) Defendants Rebecca and Akins, with Defendant Spiegle, intended to conduct a forensic evaluation without Plaintiff's knowledge or

permission, and to have Defendant Spiegle serve as a witness for Defendant Rebeca at the upcoming custody modification trial.

145. In Plaintiff's response to appear for the telephone hearing, Plaintiff presented Judge Buchanan with notice stating his concerns over the inadequacies of a telephone hearing on the issues in question, and for the need of procedural safeguards provided for under Colorado Rules of Civil Procedure (C.R.C.P.) to protect and enforce substantive due process.  C.R.C.P. 16.2 – Case Management (Domestic Relations) addresses proper notice, preparation for hearing, evidence and witness testimonies.

146. Judge Buchanan ignored Plaintiff's expressed concerns and absent an evidentiary hearing, issued an order against Plaintiff for exercising his parental right to withdraw consent for the minor child's "counseling" sessions with a psychologist for whom Plaintiff raised credible concerns and sought a second opinion.

147. Judge Buchanan also ordered Plaintiff must pay for half of all costs of the minor child's counseling with Defendant Spiegle, against Plaintiff's objections and his previously withdrawn parental consent.

148. Defendants' Association-in-Fact intentionally devised two schemes to defraud Plaintiff of the intangible right to honest services, and to defraud Plaintiff out of money and property by means of material false representations to the Enterprise through: a) the acts of Defendants Ridings and Akins, aided by the resources of Defendants KRV PC & SPAL PC, and Defendant Richard F. Spiegle, Psy.D. to further a false narrative, including fraudulent and material misrepresentations against Plaintiff directed at the Enterprise (*see* ¶¶ 115-118 re: ECHELON, and ¶¶ 142-147); b) causing and attempting to cause the obstruction of justice by perpetrating fraud and material

misrepresentations on the Enterprise to induce an outcome favorable to Defendants; c) the use of "kickbacks" as enabled by federal Title IV financial incentive payments and 42 U.S.C. § 654(7) [*see also* ¶¶ 111-114 for explanation]; d) redistribution and transfer of Plaintiff's property to Defendants by all achievable means, including the exploitation and use of the Enterprise's operations under color of law (*see* ¶¶ 133-134 re: Acts and Liabilities Under 18 U.S.C. § 1589(b)); e) depleting by all available means Plaintiff's financial resources and ability to defend, including using the Enterprise to induce involuntary servitude on the Plaintiff through court-ordered financial obligations and debts, (*see* ¶¶ 133-134 re: Acts and Liabilities Under 18 U.S.C. § 1589(b); ¶¶ 135-136 re: Acts and Liabilities Under 18 U.S.C. § 1951) and, f) tortuous interference with Plaintiff's business relations such as those acts committed throughout 2012 by defendants Ridings and KRV PC that interfered with Plaintiff's efforts to secure employment, contracts and income (note: the court record shows defendants harassed Plaintiff's business associates, past and prospective employers, via wire, with threats of involving them in Plaintiff's litigation through the use and threat of use of trial subpoenas); the Defendants did so with the intent to defraud; and the Defendants used and caused to be used both the mail and wire transfers in furtherance of and to carry-out their schemes.  Specifically, Defendants employed the mail and wire in at least 29 separate instances to further the artifices to defraud and to deny Plaintiff access to Honest Services and an impartial tribunal, specifically:

      i)     To harass Plaintiff's business associates, past and prospective employers. (at least 3 instances, involving ECHELON, R. Glaser/IDEX Corp, various executive recruiters and headhunting agencies)

ii)  To transfer funds to sustain the operations and management of the Defendants' Association-in-Fact enterprise in Illinois and Colorado. (more than 2 instances)

iii)  On or around late May, early June 2013 to serve Plaintiff notice of Defendant Rebecca's Motion to Enforce Judgment – Child Support entered with the Illinois court; (1 instance)

iv)  On or shortly after February 18, 2014, to transmit the Illinois "Uniform Support Order," a court-ordered interstate commercial debt obligation, to Colorado; (1 instance)

v)  Throughout the period from April 2014 to December 2014, to transmit invoices for Defendant Spiegle's professional services objected to by Plaintiff, and subsequently in December 2016 to transmit a court order for payment; (at least 8 instances)

vi)  On or shortly after February 2016, through the services of the Enterprise's operations in Colorado, to transmit notice to garnish Plaintiff's wages and pre-tax income to Plaintiff's employer in Wisconsin; (at least 1 instance)

vii)  From March 2016 through November 2016, to wire without Plaintiff's consent his monthly wages and pre-tax income, totaling approximately $21,600 USD, to the Enterprise in Colorado, and subsequently by wire or mail to Defendant Rebecca; (9 instances)

viii)  On or shortly after December 23, 2016, to wire without Plaintiff's consent his retirement savings of approximately $7,200 USD from New York to Defendant Rebecca in Colorado. (1 instance)

ix)  From February 2014 to present, on an annual basis, to bill Plaintiff for service fees Defendants caused to be incurred by THE STATE OF ILLINOIS for maintaining records. (3 instances)

**Injury and Loss to Plaintiff's Business and Property**

149. Plaintiff suffered injuries and losses to business (rental income from a pre-marital property located at 375 West Erie Street, Chicago, Illinois the equivalent of $1,850 USD gross monthly) and property from both the direct and proximate causes arising from the acts perpetrated by Defendants' Association-in-Fact. Specifically, these include: (a) expenses arising from litigation producing the November 9, 2012 outcome and accruing thereafter which is estimated more than $500,000 USD, (b) loss of rental property income, which is estimated well more than $28,800 USD, (c) loss of financial assets and retirement savings well more than $95,000 USD, and (d) loss of real property (pre-marital property at 375 West Erie Street, Chicago, Illinois), which is estimated more than $375,000 USD. Plaintiff has not completed a comprehensive accounting of the financial damages incurred, but estimate the magnitude to exceed $1.1 Million USD and accruing, from direct and proximate causes arising from defendants' racketeering predicate acts.

150. WHEREFORE, for these injuries, Plaintiff seeks civil remedies provided under 18 U.S.C. § 1964, including disgorgement of defendants' illicit gains as allowed. Additionally, Plaintiff seeks injunctive relief where appropriate and as provided for under 18 U.S.C. §§ 1345, 1514; and/or 28 U.S.C. § 2283; and all additional remedies this Honorable Court deems fair and just.

## COUNT 3 – CIVIL VIOLATIONS OF 18 U.S.C. § 1962 (d)

### Defendants

151. Plaintiff alleges civil violations of 18 U.S.C. § 1962(d) by the following defendants:

    i)    Defendant Rebecca for acts and liabilities under 18 U.S.C. § 1584; 18 U.S.C. § 1589(b); 18 U.S.C. § 1951; 18 U.S.C. § 1952; 18 U.S.C. §§ 1341, 1343; in conspiracy to violate 18 U.S.C. § 1962(c).

ii)   Defendant R.M. Murray for acts and liabilities under 18 U.S.C. § 1584; 18 U.S.C. § 1589(b); 18 U.S.C. § 1951; 18 U.S.C. § 1952; in conspiracy to violate 18 U.S.C. § 1962(c).

iii)  Defendant D. Murray for acts and liabilities under 18 U.S.C. § 1584; 18 U.S.C. § 1589(b); 18 U.S.C. § 1951; 18 U.S.C. § 1952; in conspiracy to violate 18 U.S.C. § 1962(c).

iv)   Defendant Jensen for acts and liabilities under 18 U.S.C. § 1584; 18 U.S.C. § 1589(b); 18 U.S.C. § 1951; 18 U.S.C. § 1952; in conspiracy to violate 18 U.S.C. § 1962(c).

v)    Defendant Ridings for acts and liabilities under 720 ILCS 5/32-4e; 720 ILCS 5/33-1; 18 U.S.C. § 1584; 18 U.S.C. § 1589(b); 18 U.S.C. § 1951; 18 U.S.C. § 1952; 18 U.S.C. §§ 1341, 1343; in conspiracy to violate 18 U.S.C. § 1962(c).

vi)   Defendant Akins for acts and liabilities under C.R.S. § 18-8-306; 18 U.S.C. § 1584; 18 U.S.C. § 1589(b); 18 U.S.C. § 1951; 18 U.S.C. §§ 1341, 1343; in conspiracy to violate 18 U.S.C. § 1962(c).

vii)  Defendant Spiegle for acts and liabilities under 18 U.S.C. § 1951; 18 U.S.C. §§ 1341, 1343; in conspiracy to violate 18 U.S.C. § 1962(c).

**Defendants Engaged in Conspiracy to Violate 18 U.S.C. § 1962(c)**

152. Defendants Rebecca, R.M. Murray, D. Murray, Jensen, Ridings, KRV PC, Akins, SPAL PC, and Spiegle, in conspiracy participated directly in the operations and management of Defendants' Association-in-Fact through a pattern of racketeering activities as charged in Count 2, which are:

a)    An Enterprise existed as alleged in COUNT 2 – CIVIL VIOLATIONS OF 18 U.S.C. § 1962(c);

b) The Enterprise engaged in interstate commerce as alleged in COUNT 2 – CIVIL VIOLATIONS OF 18 U.S.C. § 1962(c);

c) These defendants were associated with an Enterprise (via Association-in-Fact) as alleged in COUNT 2 – CIVIL VIOLATIONS OF 18 U.S.C. § 1962(c);

d) That from as early as May 2011 to February 2014, Defendants Rebecca, Ridings, KRV PC, and other defendants named herein, reached an agreement or came to an understanding for how to conduct and participate in the affairs of their Association-in-Fact enterprise, directly and indirectly, through a pattern of racketeering activity described in COUNT 2 – CIVIL VIOLATIONS OF 18 U.S.C. § 1962(c); and

e) That the defendants named herein voluntarily and intentionally joined in the agreement or understanding, either at the time it was first reached or at some later time in the Association-in-Fact enterprise's existence; and at the time the defendant joined in the agreement or understanding he/she specifically intended to otherwise participate in the affairs of their Association-in-Fact enterprise in activities associated with the Enterprise.

### Plaintiff's Injuries and Relief Sought

153. Plaintiff was harmed by Defendants' conspiracy to commit racketeering, suffering loss of property, damage to business income, and other injuries as summarized in COUNT 2 – CIVIL VIOLATIONS OF 18 U.S.C. § 1962(c).

154. WHEREFORE, for these injuries, Plaintiff seeks civil remedies provided under 18 U.S.C. § 1964, including disgorgement of illicit gains where permitted. Additionally, Plaintiff seeks injunctive relief as provided for under 18 U.S.C. §§ 1345, 1514; and/or 28 U.S.C. § 2283; and all additional remedies this Honorable Court deems fair and just.

## COUNT 4 – 14th Amendment Violation of UIFSA § 605(b)(2) and C.R.S. §§ 14-5-607 (42 U.S.C. §§ 1983)

### Defendants

155. Plaintiff alleges 14th Amendment violations of equal protection under law and statutes by the following state defendants: Denver District Court, Colorado DHS, Denver County, and Denver DHS-CSS each as "persons" acting on state policies, local rules, customs and practices in the supervision and training of judges and state employees in the administration and enforcement of statutes, both state and federal.

### Acts and Liabilities

**Violations of C.R.S. §14-5-607 – Right to Contest of registration or enforcement.**

156. By federal right provided in the Fourteenth Amendment, Plaintiff has a right to equal protection under federal and state laws and statutes, and is entitled to be free from discriminatory practices. Plaintiff's rights to equal protection under C.R.S. § 14-5-607 and UIFSA § 605(b)(2)[2], were violated when defendants Denver District Court, Colorado DHS, Denver County, and Denver DHS-CSS denied Plaintiff's right to contest before a tribunal[3] the legality of the Illinois "Uniform Support Order" when defendants Rebecca, Akins and SPAL PC moved to register and enforce the order in the State of Colorado; further, defendants Denver District Court, Colorado DHS, Denver County, and Denver DHS-CSS allowed these violations to proceed in favor of policies, customs

---

[2] *See*: "UNIFORM INTERSTATE FAMILY SUPPORT ACT, Last Amended or Revised in 2001," National Conference of Commissioners on Uniform State Laws, December 2001, Ibid. pp. 84 – Section 605.
[3] Pursuant to C.R.S. § 14-5-103 Tribunals of this state. The court and administrative agency are the tribunals of this state [for controversies involving the UIFSA]. The administrative agency of record is Denver DHS-CSS and Colorado Department of DHS. See also, Article III, Section 3 Constitution of the State of Colorado – Executive Branch powers to enforce statutes; Denver DHS-CSS and Colorado DHS are under the Executive Branch.

and practices, and failed to convene a tribunal to intervene when reasonable opportunities were presented.

### Factual Allegations

157. On or around May 29, 2015 defendants Rebecca, Akins and SPAL PC petitioned defendant Denver District Court to register and enforce the Illinois "uniform support order" against Plaintiff.

158. On October 22nd 2015, defendant Denver District Court under Judge Goldberg entered an order denying Plaintiff's verified complaint and request for a UIFSA hearing; and denying Plaintiff's demand for declaratory judgment, stay of order and emergency injunctive relief.

159. Thereafter, Plaintiff attempted to initiate a tribunal review with defendants Denver DHS-CSS and Colorado DHS on several separate occasions, to no avail.

160. On November 6, 2015 Plaintiff issued a notice to Defendant Denver DHS-CSS, addressed to the attention of Ms. Jennifer Johnson, informing Defendant Denver DHS-CSS that this matter has been removed to the U.S. District Court for the District of Colorado, that Plaintiff challenges to the validity of the Illinois "uniform support order", that Notice of Removal was served upon the Defendant Denver District Court, Defendant 19th Judicial Circuit Court, and the superior courts in Illinois on the same day the federal removal was entered.

161. On January 15, 2016, Monica Jackson and Lara Delka, and other employees of Defendant Denver DHS-CSS, issued an *Income Withholding for Support* under color of law, demanding to garnish Plaintiff's wages from his employer headquartered in the State of Wisconsin.

162. On January 18, 2016, the Defendants Colorado DHS and Denver DHS-CSS, issued a *Notice of Noncompliance with a Child Support Order – Driver's License Suspension*.

163. On January 21, 2016, Plaintiff issued *Notice of Violation Warning - Denial of Rights Under Color of Law* to Jackson and Delka, as well as to their attorneys Robert Wolf and Amy Packer at Defendant Denver DHS-CSS.

164. Defendant Denver DHS-CSS refused to voluntarily stay actions pending a review by tribunal of the controversy. Direct garnishment of Plaintiff's income from an employer in the State of Wisconsin commenced in March 2016, as Plaintiff's wire-transferred deposits in Colorado reflected the amount Defendant City and County of Denver garnished from his pre-tax income.

165. Defendants Denver County, State of Colorado, Denver DHS-CSS, were further notified during March/April 2016, again during July/August, later in September 2016, and most recently in February 2017 by Plaintiff in affidavits charging fraud was perpetrated in obtaining the underlying court order and that UIFSA guidelines, and statutes were not followed in the creation of the child support order.

166. Plaintiff alleges the court-imposed Illinois "Support Order" was unlawfully obtained, making the "Support Order" *void ab initio* by law and unenforceable.

167. Plaintiff was deprived of his federal rights by defendant Denver District Court to equal protection under C.R.S. § 14-5-607 and UIFSA § 605(b)(2) on his June 2nd, 2015 petition, [*see* ECF #40, Attach. 3], and thereafter on multiple occasions from 2015 to 2017 with defendants Denver DHS-CSS and Colorado DHS [*see for example* ECF #40, Attach. 7, 8], when Plaintiff's requests for a tribunal hearing to challenge registration and enforcement were repeatedly denied.

## Plaintiff's Injuries and Relief Sought

168. Defendants' violations of UIFSA § 605(b)(2) and C.R.S. § 14-5-607 resulted in Plaintiff being harmed by suffering loss of property, incurring a commercial debt obligation in the form of

arrearages exceeding $80,000 USD and growing at 12% or more interest on the amount owed, as well as garnished income and retirement savings totaling approximately $29,000 USD. Altogether, damages and loss of property exceeds $109,000 USD and accruing at 12% or more interest per annum on the arrearages amount owed.

169. WHEREFORE, for these injuries, Plaintiff seeks prospective injunctive relief, and compensatory, nominal and punitive damages where allowed, against the various defendants, including disgorgement if applicable.  Additionally, Plaintiff seeks relief as provided for under 28 U.S.C. § 2283 and 42 U.S.C. § 1983, or remedies deemed fair and just by this Honorable Court.

## COUNT 5 – CRS § 14-10-124 IS UNCONSTITUTIONAL

170. Any statute, regulation, or rule pretending to ostensibly provide any state court with authority to grant or award child custody or support, within divorce and similar actions involving children, but without also requiring first an affirmative substantive due process finding of serious parental unfitness, is directly unconstitutional upon its face, must fail the test of constitutionality, and is also hereby challenged as patently unconstitutional for all the aforementioned commanding reasons. (*See*: 16 Am Jurisprudence 2d sec 256 " the general rule is that an unconstitutional statute, whether federal or state, though having the form and name of law is in reality no law, but wholly void and ineffective for ANY purpose since unconstitutionality dates from enactment and not merely from the date of the decision so branding it. NO REPEAL of enactment is necessary, since an unconstitutional law is void."  See also *Marbury v Madison* 5 U.S. 137 (1803)).

171. Is the Colorado Family Code under Title 14 – Domestic Matters, Article 10 § 124 – *Best Interest of Child*, facially unconstitutional individually in virtually every sentence, paragraph, and section – but most significantly where it absolves the court from applying the appropriate strict

scrutiny test of "clear and convincing" to charges, allegations and evidence, as well as from necessarily requiring the courts to consider and invoke the doctrine of the "least-restrictive-means" test (*see*, *A.J. v. K.A.O*, 951 So. 2d 30 (Fla. Dist. Ct. App. 5th Dist. 2007)) before infringing the parent-child liberty interest in an administrative court proceeding, and absent the protections available to the accused in criminal proceedings when liberties are infringed; and further written in a manner to preclude narrowing by judicial opinion?

### Plaintiff's Standing to Challenge Colorado Statutes

172. Plaintiff is the natural parent of a minor child, both residing within the jurisdiction of the STATE OF COLORADO and subject to its laws, including C.R.S. 14-10-124.

173. Plaintiff has never been found by any court of competent jurisdiction to be unfit or an absent, non-custodial parent; in fact, Plaintiff possesses and enjoys his full parental rights to both legal and residential custody, shared equally with the minor child's natural mother in joint-custody.

174. Plaintiff has litigated in the state courts of Colorado, in defendant Denver District Court, and has been detrimentally subjected to the authority and provisions of C.R.S. § 14-10-124 and has had his parental rights abrogated and infringed by the State without the State showing parental unfitness, endangerment or neglect; parens patriae was imposed upon Plaintiff over his objections and absent substantive due process.

175. Plaintiff now challenges the constitutionality of C.R.S. § 14-10-124 as administered by the State and its courts, invoking his right to access a federal Article III Court of Record pursuant to 28 U.S.C. § 1331; this U.S. District Court has original jurisdiction and venue is proper.

1

2
#### **Argument**

3    176. Plaintiff invokes the Overbreadth Doctrine, as the public policies of the STATE OF

4    COLORADO regarding "best interest of a child" in suits affecting the parent-child relationship

5    grant broad sweeping powers to state family court judges that quell fundamental rights protected

6    under the 1st, 4th, 5th, 9th, and 14th Amendments of the federal constitution, that quells protected

7    activities of a fit parent, and that fundamentally alters the nature of the intimate and expressive

8    relationship between parent and child.  These policies further create a climate of fear in the family

9    law attorney community that inhibits willingness of those attorneys to bring constitutional claims,

10   to assert the constitutional rights of their clients, and even to admit publicly that the Family Code

11   of these states may violate the federal constitution while failing to achieve any legitimate interest

12   the state may have in protecting children from harm.

13   177. Where the State seeks to protect children from harm, Plaintiff asserts the State has less

14   drastic means at its disposal, see *American Civil Liberties Union v. Johnson*, 194 F. 3d 1149, 1156

15   - Court of Appeals, 10th Circuit 1999, and *Home Box Office, Inc. v. Wilkinson*, 531 F.Supp. 987,

16   997 – Dist. Court, D. Utah 1982.

17   178. Plaintiff claims Colorado Family Code under Title 14 – Domestic Matters, Article 10 §

18   124 – *Best Interest of Child*, is facially unconstitutional individually in virtually every sentence,

19   paragraph, and section – but most significantly where it absolves the court from applying the

20   appropriate strict scrutiny test of "clear and convincing" to charges, allegations and evidence, as

21   well as from necessarily requiring the courts to consider and invoke the doctrine of the "least-

22   restrictive-means" test before infringing the parent-child liberty interest in a civil court proceeding

23

24

and absent the protections available to the accused in criminal proceedings when liberties are infringed; and further written in a manner to preclude narrowing by judicial opinion.

179. WHEREFORE, Your Plaintiff seeks a declaratory judgment, and a legal summary and explanation of this Honorable Court's opinion.

## **SUMMARY AND PRAYER**

180. **WHEREFORE,** your undersigned Plaintiff, Gilbert T. Tso, now prays for:

A. this United States District Court to proceed with trial by jury on the matters in controversy and of federal questions raised in this complaint, for appropriate declaratory and injunctive relief, and/or to further decide any supplementary matters; and

B. for a declaration clarifying the Federal criteria to be classified as a "Noncustodial Parent" (i.e. FNCP) within the meaning and purpose of Subchapter IV, *Grants to States for Aid and Services to Needy Families with Children and for Child-Welfare Services*, 42 U.S.C. §§ 601-679; and

C. for a favorable finding on Count 1 against defendants, and an award of compensation to Plaintiff in an amount of no less than $95,000 USD plus any other equitable relief determined on the evidence at trial by jury; and

D. for a favorable finding on Counts 2 and 3 against defendants, and civil remedies permissible under 18 U.S.C. § 1964, declaratory and injunctive relief permissible under 18 U.S.C. §§ 1345, 1514 and/or 28 U.S.C. § 2283, for actual, consequential and exemplary damages, plus any other equitable relief determined by the evidence at trial by jury; and

E. for a favorable finding on Count 4 against defendants for relief permissible under 42 U.S.C. § 1983 and 28 U.S.C. § 2283, including any judgment ordering prospective injunctive relief, remunerations or awards of a compensatory or punitive nature as allowed by statute against each specific individual defendant; and

F.  for a declaratory judgment with a legal summary and explanation finding that the state of Colorado's C.R.S. § 14-10-124 to be unconstitutional and a violation of the people's right to substantive due process in the interest of parental rights; and

G.  for any other relief this Honorable Court deems just and equitable.

Respectfully submitted,

Gilbert T. Tso
4255 Kittredge St., #922
Denver, CO 80239
Tel: (312) 339-1968
Email: gilbert.tso@gmail.com
*Pro Se / Pro Per Petitioner Party of Record*

## **VERIFICATION**

I hereby declare, verify, certify and state, pursuant to the penalties of perjury under the laws of the United States, and by the provisions of 28 USC § 1746, that all the above and foregoing representations are true and correct to the best of my knowledge, information, and belief.

Executed at _____Adams_____ COUNTY, COLORADO, this 9th day of June 2017.

Gilbert T. Tso
4255 Kittredge St. # 922
Denver, CO (312) 339-1968
Email: gilbert.tso@gmail.com
*Pro Se Petitioner Party of Record*

SWORN TO and subscribed before me this __9__ day _____June_____, 2017.

Notary Public

DIANE KIM
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20164032631
MY COMM. EXPIRES AUGUST 24, 2020

## CERTIFICATE OF SERVICE

This is to certify that I have duly served the within PLAINTIFF'S VERIFIED

COMPLAINT (2ND Amended) upon all parties herein by depositing copies of same in the

United States mail, first-class postage prepaid, at Denver, Colorado, and via E-Mail, this

9th day of June 2017 addressed as follows:

### By U.S. Postal Mail & E-Mail:

Allison R. Ailer, Ass't. Att'y General
State of Colorado
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203
E-Mail:  allison.ailer@coag.gov
*Counsel of Record

Robert A. Wolf, Esq.
City and County of Denver
1200 Federal Blvd., 4th Floor
Denver, CO 80204
E-Mail:  robert.wolf@denvergov.org
*Counsel of Record

Tory D. Riter, Esq.
Kelly L. Kafer, Esq.
Baldwin Morgan & Rider, P.C.
1512 Larimer Street, Ste. 450
Denver, CO 80202
E-Mail:  tory@bmrpc.com
        kelly@bmrpc.com
*Counsels of Record

Richard M. Murray, Esq.
Ryan E. Warren
Polsinelli P.C. - Denver
1401 Lawrence Street, Ste. 2300
Denver, CO 80202
E-Mail:  rmurray@polsinelli.com
        rwarren@polsinelli.com
*Counsels of Record

Eric M. Ziporin
Ryan F. McGrath
Senter Goldfarb & Rice, LLC
3900 East Mexico Avenue
Suite 700
Denver, CO 80210
E-Mail:  eziporin@sgrllc.com
        rmcgrath@sgrllc.com
*Counsels of Record

Gilbert T. Tso
4255 Kittredge St. # 922
Denver, CO (312) 339-1968
Email: gilbert.tso@gmail.com
*Pro Se Petitioner Party of Record*